517 F.2d 1275
 88 L.R.R.M. (BNA) 2720, 171 U.S.App.D.C. 1,
76 Lab.Cas. P 10,661,
1 Employee Benefits Ca 1239
 Stephen PETE on behalf of himself and all others similarly
situated, Appellees, Louis Belton et al.,
Plaintiff-Intervenor-Appellees,
v.
UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND
OF 1950 et al., Appellants.
Slimp KISER, on behalf of himself and all others similarly
situated, et al.,
v.
Harry HUGE et al., and United Mine Workers of America
Welfare and RetirementFund of 1950, Appellants.
Slimp KISER, on behalf of himself and all other persons who
have been deniedpension payments from the United
Mine Workers of America Welfare and
RetirementFund, et al., Appellants,
v.
W. A. BOYLE et al.
 Nos. 73-1270, 73-1393 and 73-2197.
 United States Court of Appeals,
District of Columbia Circuit.
 Feb. 12, 1975.
 
 Harry Huge and Fred M. Vinson, Jr., Washington, D. C., for appellants in all cases. Michael P. Bentzen, Joseph McFadden, Ian D. Lanoff, Monica Gallagher, Joseph A. Rafferty, Jr., Washington, D. C., and M. E. Boiarsky, Charleston, W. Va., were on the brief for appellants in Nos. 73-1270 and 73-1393. Walter P. O'Connell, Washington, D. C., also entered an appearance for appellants in No. 73-1270.
 Louis Rabil, Washington, D. C., with whom Manfred J. Schmidt and Edward J. Gorman, Jr., Washington, D. C., were on the brief for appellees in No. 73-1270.
 J. Michael Farrell, Washington, D. C., with whom Daniel L. O'Connor, Washington, D. C., was on the brief for appellees in No. 73-1393.
 Julian H. Singman and Martin Shulman, Washington, D. C., were on the brief for intervenor/appellees Belton, Duvall and Lawson in No. 73-1270 and also entered appearances for appellants Adkins, Hensley and Madden in No. 73-2197.
 Joseph A. Yablonski, Clarice R. Feldman, Washington, D. C., Lewis D. Sargentich, Cambridge, Mass., Daniel B. Edelman and Steven B. Jacobson, Washington, D. C., filed a brief on behalf of United Mine Workers of America as amicus curiae on the Matter of Attorneys' Fees.
 Guy Farmer and William A. Gershuny, Washington, D. C., filed a brief on behalf of Bituminous Coal Operators' Association Inc. as amicus curiae in Nos. 73-1270 and 73-1393.
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.
 LEVENTHAL, Circuit Judge:
 
 
 1
 These class actions are the latest, and hopefully the last, in a series of cases challenging the validity of the "signatory last employment" provision limiting eligibility for the flat retirement pension provided by the United Mine Workers of America Welfare and Retirement Fund of 1950 (the Fund).[1] Plaintiff classes consist of miners whose applications for retirement benefits were denied. The Pete class consists of coal miners who retired prior to February 1, 1965. Their applications were denied because they did not cease work in the coal industry immediately following some period of employment by a mine operator signatory to the National Bituminous Coal Wage Agreement.[2] The Kiser class consists of coal miners who retired between February 1, 1965, and August 14, 1970. Their applications were denied because they did not cease work in the coal industry immediately following one year of employment by a signatory operator.[3]
 
 
 2
 In separate district court proceedings, the plaintiff classes obtained summary judgments invalidating the pertinent signatory last employment requirements and ordering that the miners be placed on the pension rolls and paid retroactive benefits from the dates on which their pension applications were denied.[4] Appeals were taken and consolidated, and on August 5, 1974, a division of this court affirmed the invalidation of the signatory last requirements and the grant of prospective and retrospective pension benefits. The panel, with a dissent by Judge Edwards, affirmed the Kiser judgment giving relief to miners who had one year of signatory service at any time.[5] The division was unanimous in overturning the district courts' denials of interest on retroactive payments and in modifying the amounts awarded to attorneys for the plaintiff classes.
 
 
 3
 On October 2, 1974, the court granted rehearing en banc and informed counsel, through letter of its clerk, that the court "is particularly interested in the issues raised in the dissenting opinion of Circuit Judge Edwards."[6]
 
 
 4
 In its present posture, the case is before the court in the context of a partial acquiescence by the Trustees, whereby all members of the Pete and Kiser classes who had more than five years' contributory employment have been enrolled as pensioners.[7] To that extent, there is no pending controversy and plaintiffs' actions have yielded relief.
 
 
 5
 The basic controversy remaining for resolution concerns the period of signatory service needed to qualify for a pension and the extent of and the inclusion of interest in the retroactive payments owed qualifying miners. With respect to matters pertaining to the award of fees to plaintiffs' attorneys, the opinions of the panel, written by Judge Wilkey, are reinstated. The pertinent portions of the panel opinions appear in the Appendix to this opinion.
 
 I. BACKGROUND
 
 6
 The origin of the Fund and its operation were succinctly sketched by Judge Wilkey in the Kiser panel opinion (slip opinion at 3):The Fund is an irrevocable trust established by the National Bituminous Coal Wage Agreement of 1950 under the authority of section 302(c)(5) of the Labor-Management Relations Act of 1947. It is administered by three Trustees: one selected by mine operators who have signed the Agreement (signatories), one designated by the United Mine Workers of America, and one neutral selected by the other two. Each signatory operator must pay into the Fund royalties based on the quantity of coal it produces. From the accumulated royalties and the income earned by investing the Fund's principal, the Trustees are charged with paying various benefits to employees of the coal operators, including medical and hospital costs, pensions, and compensation for work-related injuries and illnesses. Under the Agreement the Trustees have full authority to establish criteria with respect to eligibility for benefits. The pension plan adopted by the Trustees provides for flat monthly payments to all retired miners who meet applicable eligibility criteria. (Footnotes omitted.)
 
 
 7
 The eligibility requirements established by the Trustees have varied over the course of the Fund's existence. At the outset, Resolution No. 10, adopted on April 5, 1950, required that an applicant be at least 60 years of age at the time of application, have 20 years service in the coal industry with one year's employment immediately preceding retirement, and have permanently ceased work in the industry after May 28, 1946.[8] In early 1953, Resolutions Nos. 30 and 31 amended these criteria to require that the 20 years service have taken place within the 30 years immediately preceding the date of pension application.[9] Both the one year and the "20 out of 30" requirements were designed "to prevent large numbers of miners who had been long separated from the industry from establishing retirement after May 29, 1946 by returning for temporary employment of, say a few months or even weeks."[10]
 
 
 8
 Although the "signatory last employment" requirement was not expressly set forth in a resolution until 1960, it was a feature of the Fund's administration at a much earlier date. This fact is not controverted; it appears in Roark v. Boyle (Roark II), 141 U.S.App.D.C. 390, 439 F.2d 497 (1970), is relied on by some of the Pete class plaintiffs and was conceded by the Trustees at oral argument.[11] As to texts of the resolutions, we have Resolution No. 56, adopted April 11, 1960, as clarified by Resolution No. 57, September 27, 1960, requiring that an applicant have "(p)ermanently retired from and ceased work" in the coal industry "following regular employment in a classified job . . . as an employee of an operator signatory to the National Bituminous Coal Wage Agreement of 1950."[12] The phrase "following regular employment" was administratively construed by the Trustees to mean "immediately following one year's signatory employment."[13] By Resolution No. 63 miners retiring subsequent to February 1, 1965, were given express notice of the one year's signatory last employment requirement.[14]
 
 
 9
 This court's 1968 decision in Roark v. Lewis (Roark I)[15] considered a challenge to use of the signatory last provision of Resolutions Nos. 56 and 57[16] to deny pension applications filed by three miners, with between 9 and 15 years' signatory service and between 29 and 42 years' employment in the coal industry. We concluded that the "applicants made out a prima facie case as to the requirement's unreasonableness" and remanded for a determination of whether there was a "rational nexus between the Fund's purpose and the requirement."[17]
 
 
 10
 On August 14, 1970, following the remand, we held in Roark II that although the bare signatory last employment requirement would have been reasonable in the early years of the Fund, it was arbitrary as to the plaintiffs who retired "at a time when significant contribution histories (were) broadly available."[18] Roark II stated that the validity of a signatory last employment provision requires a context "that conditions eligibility on a period of contributory employment that is of sufficiently significant duration to warrant eligibility for a flat pension" a duration of at least five years.[19] In Roark II and its progeny this court has repeatedly found the signatory last employment requirement inequitable when applied to exclude miners with substantial signatory service ranging from eight to more than sixteen years.[20] We have no occasion to examine the particulars of each of these decisions since our resolution of this appeal is consistent with, though not dependent on, those prior cases.
 
 
 11
 In shaping relief in Roark II, we stated that "the Trustees are not prohibited by our decision from establishing valid eligibility requirements possibly including a requirement of a signatory last employment," and from making these retroactive "to applications heretofore rejected and subsequently presented for reconsideration."[21]
 
 
 12
 Our suggestions led to Resolution No. 83, adopted January 14, 1971, whereby the Trustees attempted to maintain, and supply a validating context for, the signatory last requirement by adding a condition of five years' signatory service. Resolution No. 83 was made applicable only to pension applications received on or after August 14, 1970,[22] the date of Roark II's issuance. Resolution No. 89, March 2, 1972, sought to amend No. 83 by adding the five year total contributory employment requirement for applications received before August 14, 1970.[23]
 
 
 13
 The Trustees promulgated the current eligibility requirements in Resolution No. 90 on October 18, 1972. That resolution retains the five year total signatory service requirement of the prior resolution, but it replaces the signatory last year provision with a condition that the applicant have worked for a contributory operator for a three year portion of his last five years in the coal industry and for a lesser portion for miners with more than ten years total signatory service.[24]
 
 
 14
 On July 15, 1969, subsequent to Roark I, the Pete miners filed their complaint. On August 28, 1970, two weeks after Roark II, the Kiser plaintiffs brought their action.[25] In Kiser, the district court judgment, issued January 19, 1973, gave relief to all plaintiffs with more than one year's signatory service.[26] The Pete judgment of January 8, 1973, enjoined denials of pension benefits based solely on the ground of lack of signatory last employment. An order entered in 1974 declared that five years' total signatory service would not be required but did not further define eligibility criteria.[27]
 
 
 15
 Shortly prior to these decisions, the Trustees entered into a settlement agreement, dated January 2, 1973, with plaintiffs in Blankenship v. UMWA Welfare and Retirement Fund. Judge Gesell's earlier historic decision in Blankenship, resolving derivative claims against the Trustees, resulted in a judgment yielding $11,500,000 to the Fund, available inter alia for pension benefits.[28] This case also involved a class action on behalf of miners denied pensions for lack of signatory last employment, and the settlement provided for pensions, commencing on January 1, 1973, with eligibility made dependent on a minimum of five years' employment with contributory operators.[29] Judge Gesell gave tentative approval to the settlement on January 2, 1973, and after full consideration gave formal approval on February 26, 1973, making benefits available to a class of 17,000 members.[30] The Pete and Kiser classes excluded themselves from participation in the Blankenship settlement, and the district judges in those cases declined to follow the Blankenship approach.
 
 II. PENSION ELIGIBILITY REQUIREMENTS
 
 16
 The claims of the Pete and Kiser plaintiffs call into question the pension eligibility criteria for miners who retired prior to Roark II and the corrective measures it stimulated. The district courts ruled that the signatory last year employment provision cannot fairly be applied as a basis for rejecting claims of the Pete and Kiser plaintiffs, the Trustees have acquiesced in this determination, and there is no live controversy on this issue.[31] The Trustees propose that a requirement of five years' contributory service during an applicant's twenty years in the industry be substituted for the invalid signatory last employment criterion.
 
 
 17
 Our prior decisions provide guidance for our analysis of the Trustees' proposal. They establish that the Trustees have "full authority . . . with respect to questions of coverage and eligibility" and that the court's role is limited to ascertaining whether the Trustees' broad discretion has been abused by the adoption of arbitrary or capricious standards.[32] Even when a requirement has been invalidated by a court of equity, as with the bare signatory last employment standard in Roark II, the Trustees are to be accorded the opportunity to fashion valid eligibility standards for "applications heretofore rejected and subsequently presented for reconsideration." 141 U.S.App.D.C. at 401-02, 439 F.2d at 508-09.
 
 
 18
 Here the district courts, after finding the signatory last employment requirement invalid, did not remand to the Trustees for a formulation of suitable substitute criteria. A remand at the present time would be superfluous in view of the Trustees' adoption of a five years' signatory service standard. Our task is to determine whether the Trustees' position of a five year contributory service provision to replace the signatory last employment requirement is arbitrary or unreasonable.
 
 
 19
 In Roark II we found that "now at a time when significant contribution histories are broadly available . . . it becomes possible more nearly to fulfill the spirit of the Taft-Hartley proviso by gearing eligibility for a full pension to a condition of substantial contributory employment." 141 U.S.App.D.C. at 396, 439 F.2d at 503. Factors detailed in the opinion relating to the eligibility requirements of other multi-employer pension plans, proposed pension legislation (enacted into law in 1974), and the particular intake and payout features of the Fund, indicate that a "period (of) less than five years (contributory employment) would manifestly not be sufficient" to "warrant eligibility for a flat pension."[33]
 
 
 20
 Eligibility requirements for miners who retired prior to Roark II was a subject expressly considered by Judge Gesell in his thorough analysis of the proposed settlement agreement in Blankenship v. UMWA Welfare and Retirement Fund. The plaintiff class in Blankenship was initially defined broadly to include miners who were ineligible for pensions because of the signatory last employment condition.[34] The settlement agreement redefined the class to restrict relief to those miners with at least five years' total signatory service in their twenty or more years in the industry.[35]
 
 
 21
 Although approval of a settlement agreement is not identical with determination of a heated contest, there is every indication that Judge Gesell addressed the Blankenship case with awareness of his responsibility, under Rule 23, Fed.R.Civ.P., to serve as "guardian of the absent parties" in scrutinizing the agreement to determine whether the proponents have shown "that the settlement is fair and reasonable."[36] As to the fairness of the exclusion of the large numbers with less than five years' signatory service, Judge Gesell concluded after holding a hearing and evaluating extensive "detailed actuarial studies" and analyses of comparable pension plans submitted in support of the compromise that "(t)he evidence demonstrates that the provisions of the settlement requiring an applicant to have had five years' contributory service is generous, fair, and equitable."[37]
 
 
 22
 In our view, a five year signatory service requirement approved by Judge Gesell and accepted by the Trustees implements the analysis of Roark II and furthers the purposes of the Fund. The provision of the Taft-Hartley Act authorizing employers to contribute to trust funds requires that such funds be "for the sole and exclusive benefit of the employees of such employer, and their families and dependents."[38] In Roark II we noted that in enacting the statute "Congress obviously contemplated payments to union welfare funds would be made by employers for the benefit of their employees" and that "a key purpose" of payment to the Fund was to assist "the employees of contributing employers."[39] We ruled that "the spirit of the Taft-Hartley proviso" would be served "by gearing eligibility for a full pension to a condition of substantial contributory employment."[40]
 
 
 23
 The Pete complaint sought a declaration that the requirement of employment by a signatory immediately prior to retirement is invalid, and an order requiring pension payments to employees "who otherwise are eligible for such benefits." (JA 7a-8a) (Pete). Apparently, the intent was to make pensions available to all of proper age who have worked in the coal industry 20 of the 30 years prior to application apparently even in the absence of any signatory service. The Kiser complaint, both as filed in August, 1970, and amended in October, 1970, alleges that "gearing eligibility for a full pension to the requirement of at least one full year as an employee in a classified job for an employer signatory . . . has no reasonable relationship or rational basis to the purpose of the Trust." (JA 11a, 17a-18a) (Kiser).
 
 
 24
 Plaintiff employees have modified their position to request that pensions be available to all persons with one year's signatory service. While courts of equity have some latitude to take action in furtherance of a trust and prevent its failure or frustration, in no substantial sense can it be said to further the private or legislative purpose underlying this trust to make the flat lifetime pensions provided for retired miners available to an applicant whose coal digging benefited the Fund through as little as one year's signatory contribution, and who may have spent 19/20 of his productive work life in the non-union mines of those competing with the signatory operators. Certainly the Trustees' refusal to grant pensions to such miners cannot be deemed arbitrary or capricious.
 
 
 25
 Plaintiff miners and the district courts have come to focus on the contention that miners are entitled to a pension on showing one year's signatory service because such a pension may have been given to others in the same position, except for the condition that their year happened to be the last year prior to retirement.
 
 
 26
 They completely miss the essential point that, in the context of the coal industry during the pertinent period, signatory service during any year of mining employment is not the equivalent of last year's signatory service. As appears from data in Roark II, industry employment declined in the 1950's and 1960's with union employment (signatory mines) falling more rapidly than the nonunion sector.[41] The data suggest that miners were not likely to transfer from nonunion to union employment, and such transfers as occurred were more likely to be from union to nonunion service. In addition to the projection from overall data, that the vast majority of miners qualifying under the signatory last year criterion would have more than one year's total contributory service, we have the advice at oral argument not strictly evidence, but serving to dramatize the thrust of the overall data that appellants' studies indicate that the overwhelming bulk of miners who have been enrolled as pensioners in the order of magnitude of 99.5% had more than five years' total contributory employment.[42]
 
 
 27
 The signatory last year employment concept was not still-born. Its vitality during the early years of the Fund, when there were no miners with substantial contributory histories, was recognized in Roark II. As of the date of Roark II, this court was aware that the overwhelming bulk of eligibles, under the last year's signatory service provision, had total signatory service that was substantial (five years or more). What the court was concerned with was the possible discriminatory unfairness, in the Fund's maturing years, of denying applications of other persons with substantial signatory service, when there was even a minimum possibility of eligibility, through last year's signatory service, on total signatory service that was not substantial. It suggested that the issue of discriminatory unfairness be removed by conditioning eligibility on substantial signatory service.[43]
 
 
 28
 Roark II can give no comfort to any miner without substantial signatory service. The only equity that was recognized was that of persons having substantial signatory service. The court stressed the need for substantial signatory service either by recognizing that last year's signatory service, though generally the functional equivalent of substantial signatory service, be conjoined with an explicit requirement of substantial signatory service or by permitting a sole criterion of substantial (at least five years) signatory service.[44] Roark II ruled that the "last year" provision could not validly be the exclusive means of defining substantial signatory service, but it certainly did not countenance that the concept of substantial signatory service be scrapped altogether. And the only awards made by Roark II and its progeny provided pension benefits to plaintiffs with between eight and sixteen years of signatory service.[45]
 
 
 29
 We need not tarry with the possibility that Roark II left a residual question arising out of a few payments having been made, on the basis of last year's signatory service, to persons without substantial signatory service. If it is premised that such payments were improper, the remedy if any would lie against the Trustees subject to whatever defenses are available to a fiduciary.[46] Equity does not take account of mistakes by requiring their escalation. The same result is reached if it is premised, on the other hand, that any past payments on the basis of the last signatory criterion are sustainable, even in the absence of substantial signatory service, on the theory that the miner met all then-existing criteria, prior to our Roark decisions, and is entitled to payment under Danti v. Lewis.[47] Plaintiffs could not proceed on that analysis. In considering plaintiffs' plea for a reconstitution of eligibility requirements by a court of equity, the latitude of an equity court is subject to the purpose of its authority, to safeguard against arbitrary or capricious actions of the Trustees which threaten to frustrate rather than fulfill the purposes of the Fund, and we would not have latitude as an equity court to dispense with the criterion of substantial signatory service (at least five years) that has been both projected in Roark II and accepted by the Trustees.
 
 
 30
 The Taft-Hartley Act presumed that management and labor would agree on pension eligibility requirements. But where, as here, the eligibility requirements thus produced are unenforceable as written, the courts do not jettison the pension. We must take into account both the broad purposes of the pension plan in its statutory setting and the reality that, in the pertinent industrial setting, the practical counterpart of the signatory last year requirement is a substantial signatory service standard. In this context, we repudiate the Trustees' original unfairness of making one year's last service an exclusive criterion of rewardable signatory service, applied so as to disallow others with substantial signatory employment, but approve the reasonableness of the Trustees' present affirmation of a total five year signatory service criterion.[48] This requirement both captures the practical impact of the signatory last year requirement and conforms to Roark II's explication of the spirit of the Taft-Hartley provision authorizing the creation of the trust.[49]
 
 
 31
 We have given careful consideration to the decisions of the district courts. The Pete court wholly failed to appreciate the Trustees' primary role in formulating an equitable replacement for the signatory last employment requirement. Its rejection of the Trustees' suggestion of a five year signatory service requirement[50] was primarily based on the ground that prior decisions of this court did not expressly consider whether plaintiffs "had any signatory employment of five years or more."[51] It failed to give due consideration to the salient fact that all of the previous plaintiffs before this court had at least eight years' contributory service.[52] The Kiser court ruled that a period of one year's contributory employment was "appropriate" because it treated the Trustees' adoption of the signatory last year employment requirement as a determination that "one year was sufficient."[53] The district judge proceeded on an oversimplified and faulty premise for, as our prior discussion shows, the Trustees' signatory last year requirement was, in practical significance and industrial context, consistent with a substantial signatory service approach. The district court's focus on the "sufficient" service contention of the particular plaintiffs failed to give due account to the element of "substantial" contributory service, identified in Roark II as the contemplation and spirit of the statute.
 
 
 32
 To sum up, eligibility for the plaintiff class is available, for those who were not enrollable under the text of the signatory last year service provision, only on a showing of substantial signatory employment, i. e., a minimum of five years during an applicant's twenty years in the industry. The others cannot offer a claim of reliance, that actions during the applicant's working life complied with the eligibility provisions then prevailing in contract or resolution. As to any appeal to equity different strands of approach converge in support of the Trustees' proffered five years' signatory service requirement first, because there is no showing of equivalence in any year's signatory service, in view of the practical context that a last year's signatory requirement generally entailed a greater contribution (see, --- U.S.App.D.C. ---, p. ---, 517 F.2d 1275, pp. 1282-1283); and second, because an equity court cannot disregard the public interest in devoting the Fund to miners who have made a substantial contribution. There may be other miners who are now in need, but for a court to ignore the Trustees' proposal and bestow a lifetime pension for any year's contributory service would confuse pensions with welfare, and interject, in the words of Judge Edwards' panel dissent, an unprecedented "judicial imposition of private philanthropy."[54]
 
 
 33
 III. EQUITIES OF RETROACTIVE RELIEF AND INTEREST
 
 A.
 
 34
 The Trustees request that we limit the district courts' orders granting pension benefits retroactive to the month following the date of denial of each qualifying class member's application to the one year period provided in the Blankenship settlement or to the period following the August 14, 1970, decision in Roark II. They urge that such limitations are necessitated by the "equities in favor of the Fund's other beneficiaries."[55]
 
 
 35
 We conclude that the Pete and Kiser miners who have performed substantial contributory employment were prevented from obtaining pensions by illegally treating an eligibility requirement (signatory last year employment provision) as exclusive. In equity, they should have been placed on the pension rolls at the time their applications were denied. It is a maxim of equity to treat as done that which should have been done a maxim whose vigor is underscored by the doctrine of constructive trusts and like principles. Plaintiffs in Roark II and its progeny have consistently been granted full retroactive benefits.[56] We therefore affirm the portions of the district courts' orders granting pension benefits retroactive to the month following the date of denial of each qualifying class member's application.
 
 
 36
 Similar considerations of equity govern the provision of interest which "is given in response to considerations of fairness (and) is denied when its exaction would be inequitable."[57] The equities in the present case argue persuasively for the provision of interest on retroactive payments to those miners with substantial contributory service. Those plaintiffs have long been denied pension benefits designed to cushion the hardship of their retirement years. Interest would serve to recompense these deserving plaintiffs without prejudicing the other pensioners, since the Fund has had the opportunity to earn a return on the wrongfully withheld payments.
 
 
 37
 As a general matter the denial of interest by a district court will not be overturned except in cases of abuse of discretion.[58] Here, however, the district courts did not weigh the equities in reaching their determinations. The Pete court merely announced without explanation that no interest would be granted[59] and the Kiser court felt compelled to reach a similar result because the plaintiffs' claims were not "liquidated sums due and payable at the dates of pension denial."[60] The district court opinions evince a firm belief that the equities favor the qualifying miners. The Pete court stressed that "(h)ad the Trustees not acted arbitrarily and capriciously, these retired miners would have over the years been receiving their pensions."[61] And the Kiser opinion concluded that "the equities in this matter are clearly with the plaintiffs (since) (t)hey have been without any form of relief for several years."[62] These assessments undercut the denials of interest payments and underscore the fairness of incorporating such benefits in the relief accorded qualifying plaintiffs.
 
 C.
 
 38
 We need not consider what would be the consequence of a showing that either retroactive relief or the provision of interest would threaten the solvency of the Fund for no such showing has been made.[63] Solvency is not in itself a basis for permitting an award, but when a trustee raises an issue of solvency to dilute or undercut an award that the court finds basically meritorious, he has the burden of showing such a detriment to the public interest.
 
 
 39
 We affirm the grant of prospective and retroactive relief to plaintiffs with five years or more signatory service and remand the interest claim with instructions to award these plaintiffs interest at six percent per annum[64] on accrued pension payments from the dates on which those payments fell due through the date on which the judgment in this case is satisfied.
 
 
 40
 So ordered.
 
 APPENDIX
 
 41
 Part VII of the Opinion of the Court in No. 73-1392, Kiser v. Huge, and part VI of the Opinion of the Court in No. 73-1270, Pete v. UMWA Welfare and Retirement Fund, issued August 5, 1974, written by Circuit Judge Wilkey, with the concurrence of Circuit Judges Tamm and Edwards.
 
 ATTORNEYS' FEES
 Kiser
 
 42
 In its opinion of 29 August 1973[66] the District Court awarded attorneys' fees on the basis of a formula whose primary component was the number of hours logged by counsel. The court took the number of hours reported by Kiser class counsel, discounted them by a factor of thirty-five percent, and multiplied by an hourly rate of $40.00 to reach a basic compensation figure of $53,680.00. The court then added a premium equal to ten percent of the hourly compensation, or $5,368.00, plus $3,000.00 for all work by counsel subsequent to August 1973. This method yielded a total compensation figure for Kiser class counsel of $62,048.00. The attorneys for consolidated plaintiffs Moore, et al., received $3,640.00, which was calculated by discounting the total hours logged by thirty percent and multiplying by an hourly rate of $40.00. The court concluded that since counsel for intervenors Adkins, et al., "should have spent no more time than the Moore group attorney,"[67] a fee equal to that received by Moore counsel, $3,640.00, would be appropriate.[68]
 
 
 43
 The fundamental principle that must guide our review of this aspect of the case is that we must pay considerable deference to the District Court's exercise of equitable discretion in setting the fees. As the First Circuit stated in Green v. Transitron Electronic Corp.:[69]
 
 
 44
 The fixing of the amounts of attorneys' fees must, of necessity, be a matter within the discretion of the district court. The lower court "has far better means of knowing what is just and reasonable than an appellate court can have." Trustees v. Greenough, 105 U.S. 527, 537, 26 L.Ed. 1157 (1881). It is the lower court that has lived with the case and, therefore, is more alert to the merits of each request for counsel fees.[70]
 
 
 45
 Applying this standard of review, we must conclude that in most respects the District Court properly exercised its discretion.
 
 
 46
 The basic criteria for the District Court's determination of the appropriate fee-setting formula were those set out in the Manual for Complex Litigation[71] and the Code of Professional Responsibility.[72] The court emphasized that the case had been decided as a matter of law on a motion for summary judgment and that the principal issues were neither novel nor complex. The court minimized the net benefit conferred on members of the plaintiff class through counsel's efforts by noting that most class members could have obtained substantially similar benefits by opting out of this case and participating in the settlement agreement in Blankenship et al. v. UMWA Welfare and Retirement Fund of 1950 et al.[73] Therefore, despite the diligence of counsel and the success their efforts yielded, the court discounted the hours logged by the attorneys[74] and ordered compensation on an hourly basis plus a premium. We think that the District Court's evaluation of the relevant factors was reasonable.
 
 
 47
 We recognize, as did the District Court, that additional factors must be considered in fixing fees for attorneys in class actions.[75] In many cases, the efforts of class counsel result in the vindication of an important statutory or other public policy. Some class litigation establishes or advances legal principles for the benefit of a substantial segment of the consuming public or the citizenry. In such cases, it may be appropriate to reward class counsel for the benefits they have conferred on the public. While we do not downgrade the service the attorneys rendered here in asserting the pension rights of poor, retired mine workers, we cannot say that their efforts produced any significant public benefit in the sense described above.
 
 
 48
 Another concern when class attorneys' fees are at issue is that class litigation involves an element of risk: if the class plaintiffs do not prevail, their counsel may recover inadequate or no compensation. Thus, it is sound policy to grant class counsel some premium for their efforts as an incentive for other attorneys to undertake the risk of prosecuting class actions. As the District Court noted, however, the counsel in the present case assumed very little risk in pressing the claims of the class plaintiffs. The essential legal principles that control this case were established in Roark II, which was decided 14 days before the complaint was filed herein[76] and almost a year before the District Court certified this suit as a valid class action.[77] Therefore, the premium awarded by the District Court, ten percent of the total hourly compensation, reasonably reflects the magnitude of the risk assumed by class counsel.[78]
 
 
 49
 In determining attorneys' fees on an hourly basis, the District Court refused to give effect to consent forms mailed by counsel to class members on 22 January 1973, three days after entry of summary judgment for the plaintiff class. The consent forms bore the official caption of the case, informed the recipients of the District Court's 19 January 1973 opinion, advised class members that "attorneys for the Class, will petition the Court for an allowance of attorney fees in an amount equal to one-third of (accrued) pension benefits," and solicited the recipients' consents to the court's allowance of fees on the basis described.[79] Signatures on these consent forms were obtained from 401 of the class members.
 
 
 50
 We agree with the District Court that fee agreements of this nature must be subjected to close judicial scrutiny under equitable principles. As we stated in Spilker v. Hankin:
 
 
 51
 Fee contracts between attorney and client are a subject of special interest and concern to the courts. They are not to be enforced upon the same basis as ordinary commercial contracts. Especially is this true where, as in this case, a contract beneficial to the attorney is executed long after the attorney-client relationship has commenced, when the position of trust is well established, and the litigation involved is reaching its culmination. "In some jurisdictions it has been held that such agreements are void. In other states contracts of such character are held to be affirmatively invalid on the ground of fraud, and the burden is on the attorney to show the fairness of the transaction in that the compensation provided for does not exceed a reasonable compensation for the services rendered or to be rendered." In re Howell, 215 N.Y. 466, 109 N.E. 572, 574. Many courts, including the courts of this jurisdiction, have gone so far as to say that they are attended by a presumption of invalidity and overreaching.[80]
 
 
 52
 In the case at bar, the District Court found that members of the plaintiff class "lack the sophistication, experience and education to act understandingly and deal with their attorneys on an equal basis at arms length."[81] The court further determined that "the amounts of the contingent fee contracts are excessive in light of the actual legal services necessary to succeed in this public interest suit."[82] These findings, plus the fact that class counsel had solicited the fee agreement without court approval and after entry of summary judgment for the class, led the court to conclude that it would be inequitable to give effect to the agreements.[83] We find this decision reasonable and therefore affirm.
 
 
 53
 The District Court also refused to enforce contingent fee agreements obtained by counsel from consolidated plaintiffs Moore, et al., and intervenors Adkins, et al.[84] Since the relevant circumstances underlying the Moore and Adkins agreements did not differ materially from those underlying the Kiser consents, we affirm this decision of the District Court as well.
 
 
 54
 The single aspect of the District Court's decision on attorneys' fees with which we cannot agree is the award of $3,000.00 to Kiser class counsel for all work to be performed after the court's order of 29 August 1973. The court attempted to justify this award with the following statement:
 
 
 55
 The work remaining in the case consists of the argument in the Court of Appeals (briefs already filed) and the resolution of the minor dispute as to whether the 310 miners or their estates are valid members of the class. In this regard the United Mine Workers of America and the Defendant Trustees were ordered on August 1, 1973 to go into the field and assist these people in the preparation and filing of applications to determine whether they were valid members of this class and thus entitled to the benefits (Tr. 51-52). This directive eliminates the need for extended future services on the part of counsel.[85]
 
 
 56
 While we do not directly contest the validity of these findings, we hold that the court's ultimate determination on fees for prospective work cannot be sustained. Any flat figure, including the $3,000.00 chosen by the District Court, is at best a mere approximation of the value of counsel's services since August 1973. The fact that the Trustees vigorously contested the merits of this case on appeal undoubtedly compelled class counsel to log a significant number of hours in preparation, even after briefing had been completed. Moreover, despite the court-ordered efforts of the Fund and Trustees to ensure that all class members are found and enrolled, class counsel had and has a responsibility to oversee the process of finally determining the class membership. Therefore, we must remand the question of attorneys' fees for a determination of the value of the services rendered by class counsel during the period between August 1973 and the termination of this litigation.[86] In making this determination, the court should consider the final time logs submitted by counsel and exercise its discretion in deciding whether to discount the time logged and what formula to apply in calculating the fees.
 
 
 57
 Finally, we think the District Court was justified in shifting liability for plaintiffs' attorneys' fees to the defendants. The established exceptions to the general "American Rule" that attorneys' fees are not recoverable by a successful litigant were most recently articulated by the Supreme Court in F. D. Rich Co. v. Industrial Lumber Co.:[87]
 
 
 58
 We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefited class.[88]
 
 
 59
 The District Court cogently brought the instant case within both exceptions. First, although the Trustees are before the court in their fiduciary capacities and thus bear no personal liability for the shifted attorneys' fees, the District Court was not unwarranted in concluding:
 
 
 60
 Justice requires that the Defendants pay the costs and attorney's fees incurred in this suit to compel the Defendants to discontinue their protracted discriminatory conduct and breach of fiduciary duty.[89]
 
 
 61
 More compelling was the court's finding that it is appropriate for the Fund to bear the cost of plaintiffs' legal fees since the "entire Fund benefited from this suit with the prevention of general fiduciary abuse and improvement of the institutional functioning of the Fund as an entity."[90]. We therefore affirm the District Court's decision to tax plaintiffs' attorneys' fees to defendants.
 
 Pete
 
 62
 In its Memorandum and Order of 24 January 1974, the District Court taxed against defendants-appellants fees for the plaintiff class attorneys totaling $240,921.00. This figure was reached by multiplying the total number of hours logged by an hourly rate of $50.00 and adding as a bonus five percent of the estimated class recovery.[10]
 
 
 63
 We must accord the District Court considerable latitude in determining the proper compensation for attorneys.[11] Hence, it would be inappropriate to upset the District Court's decisions with respect to the number of hours to be credited to class counsel and the hourly rate of compensation since we find those decisions reasonable. However, we have concluded that the District Court improperly exercised its discretion in awarding class counsel a percentage of the total class recovery. Like Kiser v. Huge, the instant case was decided at the summary judgment stage without extensive pretrial discovery. The legal issues are neither novel nor complex. While the efforts of class counsel conferred a significant benefit on plaintiffs-appellees, this case has not vindicated any important public policy nor has it advanced any legal principle of pervasive applicability. Finally, the risk of contingency factor for class counsel in undertaking this litigation was not substantial. The plaintiff class representatives filed their complaint after Roark v. Lewis[12] (Roark I) had declared the signatory last employment requirement presumptively invalid. Roark II, on which we have relied as controlling precedent, had been decided for over a year when by order of 30 September 1971 this case was certified as a valid class action.
 
 
 64
 We thus consider five percent of the total class recovery to be an excessive reward for class counsel's prosecution of this litigation, and remand the record to the District Court for recalculation of the premium. We think an appropriate basis for this determination is that employed by the District Court in Kiser v. Miller,[13] in which class counsel was rewarded with a percentage of the total hourly compensation.
 
 
 65
 On the basis of our discussion in Part VII of Kiser v. Huge, we affirm the District Court's taxation of plaintiffs' attorneys' fees against defendants-appellants.
 
 
 66
 TAMM, Circuit Judge, with whom WILKEY, Circuit Judge joins, concurring and dissenting:I concur with that portion of the majority opinion which reinstates Judge Wilkey's panel opinion on the issue of attorneys' fees. I also join Part III of that opinion which awards back pay and interest. However, I strongly dissent from Part II of the majority opinion which limits relief to members of the plaintiff classes with at least five years of signatory service. Nothing in the majority opinion convinces me that the position articulated by Judge Wilkey in the division opinion, which I joined, was erroneous. Moreover, the majority's embracement of the Trustees' eleventh-hour position on appeal represents an abdication of our judicial function and a surprising disregardance of the facts and history of this litigation. The majority's conclusion is certainly not dictated by the precedents it relies upon, nor does it represent anything more than the promulgation of retroactive eligibility requirements for a private trust by a federal appellate court.
 
 
 67
 In Kiser, the district court found the signatory last employment requirement to be invalid, and, in its equitable discretion, ordered as relief that all members of the class with at least one year of signatory employment be added to the pension rolls. In Pete, the district court on January 9, 1973 invalidated the signatory last requirement as applied to plaintiffs and "enjoined the Fund from denying the class present and future benefits." On May 25, 1973, we remanded the record to the district court for, inter alia, a determination "of what period of signatory service is a prerequisite to pension eligibility." On January 24, 1974, the district court entered a Memorandum and Order, holding, inter alia, that the class should not be held to a five-year signatory employment requirement.
 
 
 68
 The Trustees have now acquiesced in the determination that the signatory last provision is invalid in these cases. Thus, the majority cannot hold that the signatory last provision is a valid criterion when applied to applicants with less than five years signatory service. Instead, the majority seizes upon the Trustees' advancement before this court of a five-year requirement and then proclaims that the issue before us is "to determine whether the Trustees' position of a five-year contributory service provision to replace the signatory last employment requirement is arbitrary or unreasonable". Maj. Op., --- U.S.App.D.C. --- at ---, 517 F.2d 1275 at 1283 (emphasis added).
 
 
 69
 I cannot understand how a position advanced for the first time by a party can replace the district court orders as the primary issue before this court. As the Trustees themselves admit in their brief:
 
 
 70
 Neither court below was asked to exercise its equitable discretion to reshape the Fund's former eligibility standards, to correct the effects of the trustees' previous adoption of and adherence to faulty criteria. The Trustees thus appear before this court in these cases in the unenviable position of seeking reversal of the District Court decisions on the grounds that those courts failed to exercise properly equitable powers which concededly they were not requested to do so.
 
 
 71
 Appellant's Br. on Rehearing en banc at 12-13.
 
 
 72
 The majority incredibly attempts to justify this approach by arguing that according to Roark II, the Trustees should have the opportunity to fashion eligibility standards for applications hereto rejected and subsequently presented for reconsideration. The majority finds that the district courts in Pete and Kiser erroneously failed to remand the case to the Trustees, but miraculously holds that a remand by this court "would be superfluous in view of the Trustees' adoption of a five years' signatory service standards."
 
 
 73
 The particular Roark II doctrine relied upon by the majority simply has no relevance to the miners in question here. These miners did not present their applications for reconsideration to the Trustees; they sued in federal district court because they felt they were wrongfully denied their pensions in the first instance. I am confident that the plaintiffs will be amazed to discover that filing a complaint in district court was found to be equivalent to seeking an application for reconsideration.
 
 
 74
 Presumably such tortured logic was necessary in order for the majority to adopt the Trustees' position. To accept it otherwise on the facts of this case would require the overturning of established law of this court. In Roark II we concluded that "relief to the parties before us should not be limited to reconsiderations of their applications under revised eligibility standards" and ordered enrollment if they met other eligibility requirements at the time their applications were filed. 141 U.S.App.D.C. 390, 439 F.2d 497, 509 (1970). See also Collins v. UMWA Welfare and Retirement Fund of 1950, 141 U.S.App.D.C. 387, 439 F.2d 494 (1970). In DePaoli v. Boyle, we ordered the identical relief for plaintiff, who was in the same procedural position as the miners at issue here, because:
 
 
 75
 revised requirements will avail him nothing. He had filed his application prior to our decision in Roark, he has been denied a pension on the very eligibility requirement struck down in Roark, and, like Roark and Collins, he deserves the same relief.
 
 
 76
 144 U.S.App.D.C. 364, 447 F.2d 334, 338 (1971). Roark II's and DePaoli's application to the case at bar seems clear.
 
 
 77
 To bolster their holding, the majority places reliance upon our decision in Roark II, Judge Gesell's analysis of the Blankenship settlement and the Taft-Hartley Act itself as all pointing to the establishment of a five-year requirement. Under closer scrutiny, none of these provide a foundation for what is in reality the appellate imposition of such a retroactive criterion. Res judicata facit de albo nigrum et de quadrato rotundum.
 
 
 78
 Throughout its opinion, the majority relies heavily upon our decision in Roark II. It quotes from that opinion to the effect that "a 'period (of) less than five years (contributory employment) would manifestly not be sufficient' to 'warrant eligibility for a flat pension.' " Majority Op., --- U.S.App.D.C. --- at ---, 517 F.2d 1275 at 1283; see 141 U.S.App.D.C. 390, 439 F.2d at 508. However, the majority here quotes Roark II out of context and simply mischaracterizes that opinion. The Roark II statement alluded to was in reference to the context in which a signatory last requirement would be valid when coupled with a contributory employment requirement of at least five years. It plainly does not address the question of equitable relief for miners who retired prior to Roark II and were wrongfully denied their pensions because of a signatory last requirement. That such tortuosity is necessary to sustain the majority's position is further proof of its unsoundness. Moreover, while the majority is correct in identifying Roark II's suggestions in dicta that substantial contributory service should be an important validating criterion, that opinion undeniably cannot be read as supporting the imposition of a five-year requirement by this court in the first instance.
 
 
 79
 The majority notes with approval Judge Gesell's acceptance of a settlement agreement in Blankenship with a five-year contributory service requirement as "generous, fair, and equitable." The plaintiff class in Blankenship originally was defined to include all miners denied eligibility because of the signatory last requirement. The parties reached a settlement agreement, which included a five-year contributory service requirement, and submitted that agreement to Judge Gesell for approval. Of course, the parties could have reached any number of settlement agreements, which may have included contributory service requirements of six years, four years, one year, or fifteen years, and Judge Gesell may have found any of them to be "fair and equitable." Even conceding that Judge Gesell might believe that a five-year standard would be the fairest possible, Blankenship still lends no guidance as to the proper resolution of the instant classes' claims or support for this court's asserted authority to establish eligibility criteria for the Fund under the circumstances of this case, yet the majority opinion seizes upon it in a vain effort to transform a Modigliani into a Reubens.
 
 
 80
 It is appropriate, however, for the majority to rely on Blankenship for what the majority is doing is imposing on the Pete and Kiser classes the Blankenship settlement agreement. As the majority notes, the Pete and Kiser classes excluded themselves from participation in the Blankenship settlement. They litigated the merits of their claims against the Trustees before two district court judges. They could have lost or received less generous relief in equity. Nevertheless, they did prevail in both cases. However, the majority negates their exercise of free choice and throws the plaintiff classes back into the Blankenship settlement class.
 
 
 81
 Throughout its opinion, the majority speaks of fulfilling the "spirit of the Taft-Hartley proviso." That provision, section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186 (1970), authorizes the establishment of funds for the "benefit of employees." Section 302(c)(5) contains no reference to a five-year service eligibility standard for trusts authorized under it. There is nothing in the legislative history which remotely suggests such a mandatory requirement. In fact, the only fair reading of the relevant legislative history is that Congress intended the development of eligibility criteria to remain exclusively within the province of labor-management relations. Finally, there clearly is no statutory authority for the proposition that when the Trustees establish the contributory employment standard below the level where some members of this court might set it, this court can impose its own standard.
 
 
 82
 Stripped to its simplest form, the majority, while proclaiming that the Trustees' present proposal is not arbitrary or unreasonable, is in reality simply legislating by judicial fiat a five-year contributory employment requirement. The majority has elected itself trustee of the Fund and thereafter has promulgated its own retroactive eligibility standards. As we have seen, no case law, statute, or legislative history even remotely provides a springboard for this assertion of authority. The majority's purported rationale simply is inapplicable to the facts of this case. The majority "repudiate(s)" the signatory last requirement but "approve(s) the Trustees' present affirmation of a total five year signatory service criterion." Maj. Op., --- U.S.App.D.C. --- at ---, 517 F.2d 1275 at 1286 (footnote omitted). I also applaud the Trustees' reasonable present requirements. What I do not find in the majority's opinion is any principled rationale for applying these present requirements to past applications wrongfully denied.
 
 
 83
 The fact that these miners are entitled to pensions appears established by our decision in Danti v. Lewis, 114 U.S.App.D.C. 105, 312 F.2d 345 (1962). Danti established that a miner who met all existing criteria could not be denied a pension on the basis of requirements adopted by the Trustees after the date of his application. The miners in question here met all valid existing criteria. The majority, however, finds that plaintiffs "could only proceed" by the "reconstituting of eligibility requirements by a court of equity." Even if this were so, the distinction between this action, which the majority claims is beyond its power, and the action it now takes is incomprehensible.
 
 
 84
 The majority attempts to distinguish the instant plaintiffs from previous cases by arguing that the only awards made previously provided pension benefits to plaintiffs with between eight and sixteen years of signatory service. This argument is simply a post hoc rationalization by the majority to bolster the result it reaches today, and serves only to emphasize the minute legal capital contained in the majority's position. As the district courts in Pete and Kiser realized, in no previous case did we focus upon or indicate that the number of years of service was important to the decision. Until today, the vital question was whether the plaintiff was denied his pension by an arbitrary provision. Under that rule and under Danti, these plaintiffs deserve relief.
 
 
 85
 Appellants in their brief for rehearing en banc argue that "in the mountains and valleys of this country" are thousands of miners with claims indistinguishable from those of the Pete and Kiser classes except they never applied for pensions. The Fund asserts that enrollment of those other, presumably rapacious miners would decimate the Fund's resources. This argument parallels a spectre raised by Judge Edwards in his dissent to the Kiser panel opinion:
 
 
 86
 (T)he court must anticipate a class suit on behalf of all miners dead or alive who could and would have filed claims had they known such minimal signatory employment could justify a pension, seeking waiver of their failure to file promptly.
 
 
 87
 Kiser dissent at 2 n. 3.
 
 
 88
 Judge McGowan, in his separate statement, perceptively notes that "what the Fund has prevailed upon this court to do is to decide a hypothetical lawsuit adversely to those who might possibly bring it some day, but who were unrepresented in this en banc consideration." I must agree with Judge McGowan that this is the principal rationale, which the majority dresses up as its responsibility to the "public interest," for the result the majority reaches.
 
 
 89
 I, however, see little merit in the Trustees' argument. It is quite possible that the hypothetical claims are not totally identical to the ones at bar and that traditional equitable considerations, such as laches, might distinguish the Pete and Kiser classes from the "hills and mountains" class. Moreover, since, as appellants admit, the Pete and Kiser miners with less than five years contributory service number less than fifty, I am willing to await resolution of any decimation argument until there is a live controversy before us. Further, I am less than persuaded by appellants' argument, since in the two years since the district courts' decisions in Pete and Kiser, no stream of miners' applications has emerged from the valleys and hills to swamp the Fund. All these lurking plaintiffs also were originally members of the Blankenship class, but no new lawsuit has emerged since they were defined out of that class by the settlement agreement. I am not prepared to overturn the district courts' equitable determinations because of an excessive fear of the claims of litigants who are not before us.
 
 
 90
 Similarly, I cannot condemn the "errors" with which the majority credits the district courts in Pete and Kiser. The majority euphorically argues that the Pete court "failed to give due consideration to the salient fact that all of the previous plaintiffs before this court had at least eight years' contributory service." Maj. Op., --- U.S.App. --- at ---, 517 F.2d 1275 at 1286. It is hard, however, to fault the Pete court since that "salient fact" had been given absolutely no weight until today. The Pete court is also admonished for failing "to appreciate the Trustees' primary role in formulating an equitable replacement for the signatory last provision." To the contrary, unlike the majority, the Pete court followed the rule of Roark II and DePaoli and granted appropriate relief.
 
 
 91
 The Kiser court is chastised for focusing upon "the 'sufficient' service contention of the particular plaintiffs failed to give due account to the element of 'substantial' contributory service, identified in Roark II as the contemplation and spirit of the statute." Id., --- U.S.App.D.C. --- at ---, 517 F.2d 1275 at 1287. However, as indicated above, the Trustees themselves admit that such an argument was never presented to the district court. The majority claims that the district judge did not realize that "the Trustees' signatory last year requirement was, in practical significance and industrial context, consistent with a substantial service approach." However, if the evidence the majority seizes upon had been before the Trustees indicating that a signatory last provision was the functional equivalent in the coal industry to substantial contributory employment when they set the validating criteria, the signatory last provision would not have been struck down time and again as arbitrary and irrational, including this case.
 
 
 92
 If we were operating today as trustees of a newly established fund, it might make economic and practical sense to establish a contributory service requirement of at least five years. It is also undeniably true that federal legislation establishes five years as the minimum period of employment required to obtain a vested right to a percentage of a full pension. However, none of these considerations are truly relevant to the questions at issue here. What is relevant is that the duly-appointed trustees promulgated a set of validating criteria which denied miners who filed prior to Roark II their pensions on the basis of an arbitrary standard. This is a narrow case, in a narrow arena, based upon a narrow set of facts, and there appears to be no justification for what the majority attempts to do here.
 
 
 93
 Consequently, I still adhere to the position taken by Judge Wilkey's panel opinion. In Kiser, I would affirm the district court's equitable grant of a pension to all miners with over one year of contributory service. In Pete I would remand the record so that the district court could determine in the first instance the amount of total signatory service to qualify for relief. Instead, in a triumph of result-orientation, the majority legislates without adequate justification new retroactive validating criteria. I dissent from this unwarranted assertion of appellate authority.
 
 McGOWAN, Circuit Judge:
 
 94
 I voted against the rehearing en banc of these two cases for the reason that it appeared even then that the number of pension applicants involved was so limited as to give a de minimis impact to the division's decision. In the course of briefing and argument en banc, this became even more plainly apparent. The Fund concedes that less than 50 people will be benefited by that decision, and that the amount of money involved is so negligible as to have no significantly adverse consequences for its solvency.[1]
 
 
 95
 "The problem," says the Fund (Br. p. 8), is rather one involving "the rights and claims of persons who are not members of the plaintiff classes and not before the court . . ." (emphasis supplied), who may conceivably hereafter file pension applications although, unlike the plaintiff classes presently before us, they have hitherto failed to do so within the prescribed periods. Thus, what the Fund has prevailed upon this court to do is to decide a hypothetical law suit adversely to those who might possibly bring it some day, but who were unrepresented in this en banc consideration.
 
 
 96
 Under these circumstances, I do not think it is the part of either fairness or judicial wisdom for the energies of the Court en banc to be so engaged; and I do not reach the merits but vote rather to vacate the en banc order as as improvidently entered.
 
 
 
 [1]
 Previous challenges that have been heard on appeal by this court include Teston v. Carey, 150 U.S.App.D.C. 256, 464 F.2d 765 (1972); Belcher v. Carey, 82 L.R.R.M. 2437 (D.C.Cir.1972); DePaoli v. Boyle, 144 U.S.App.D.C. 364, 447 F.2d 334 (1971); Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970); Collins v. UMWA Welfare and Retirement Fund, 141 U.S.App.D.C. 387, 439 F.2d 494 (1970); and Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425 (1968)
 
 
 [2]
 See Memorandum and Order, SJA 50 (Pete) (indicating that some question existed as to whether 14 of the 312 applicants disqualified by the signatory last employment requirement also had their applications rejected for some additional reason). The Pete miners' applications were rejected under administrative interpretations and Resolutions Nos. 56 and 57. See notes 11, 12 and accompanying text infra
 
 
 [3]
 See Order Amending Order Declaring This Action to be a Properly Existing Class Action, JA 26a (Kiser). The exact number of Kiser class members has not yet been determined. See Kiser v. Miller, 364 F.Supp. 1311, 1317 (D.D.C.1973) (indicating that there were 356 enrolled class members as of August 10, 1973, and that efforts were being taken to determine whether an additional 310 miners or their estates are valid class members). The Kiser miners were denied pensions for failing to satisfy the requirements of Resolution No. 63. See note 14 and accompanying text infra
 A suit brought by Edwin Moore, James Walker, and Estill Smith (Moore group) against the Fund was consolidated with the Kiser action. Later, the district court granted Milford Atkins, James Hensley and Albert Madden (Atkins group) leave to intervene in the consolidated action. See 364 F.Supp. at 1313.
 
 
 [4]
 See Kiser v. Carey, 353 F.Supp. 736 (D.D.C.1973); Pete v. UMWA Welfare and Retirement Fund, Memorandum and Order, Jan. 24, 1974, SJA 49 (Pete); Pete v. UMWA Welfare and Retirement Fund, 352 F.Supp. 1294 (D.D.C.1973)
 
 
 [5]
 The panel remanded Pete for a determination of the period of signatory service required to obtain relief. Judge Edwards, sitting by designation, dissented on the issue of the total signatory service required as a condition for pension eligibility, urging in part that Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970), had directed the Trustees to adopt a five year contributory service standard. Slip op. at 8 (Kiser)
 
 
 [6]
 Letter from Hugh Kline, Clerk of the United States Court of Appeals for the District of Columbia Circuit, to Fred M. Vinson, Jr. et al., Oct. 2, 1974
 
 
 [7]
 See Appellants' Brief on Rehearing En Banc at 7
 
 
 [8]
 See Kosty v. Lewis, 115 U.S.App.D.C. 343, 345, 319 F.2d 744, 746 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964)
 
 
 [9]
 See id. Resolution No. 30, which required 20 years' service within the last 25 years before application, was amended a few weeks after passage by Resolution No. 31 which increased the period from the last 25 years to the last 30 years
 
 
 [10]
 See Roark v. Boyle, 141 U.S.App.D.C. at 393, 439 F.2d at 500
 
 
 [11]
 Roark II refers to the denial, for lack of signatory last employment, of 312 applications between January 1954 and December 1964. See 141 U.S.App.D.C. at 396 n. 5, 439 F.2d at 503 n. 5. The January 24, 1971, Memorandum and Order entered by the District Court in Pete noted that the plaintiff miners' "applications for pension were filed as early as 1953 and continued being filed until March 7, 1964." SJA 50 (Pete). The en banc brief of the Kiser plaintiffs (p. 14) quotes, e. g., the annual UMWA Welfare and Retirement Fund Report for the year ending June 30, 1955, which states that pension eligibility includes the requirement that the applicant have retired "following regular employment is a classified job in the mine of an operator signatory to the Agreement."
 
 
 [12]
 The pertinent provision of Resolution No. 57 is set forth in Roark v. Boyle, 141 U.S.App.D.C. at 402, 439 F.2d at 509
 
 
 [13]
 See id. at 395 n. 3, 439 F.2d at 502 n. 3
 
 
 [15]
 130 U.S.App.D.C. 360, 401 F.2d 425 (1968)
 
 
 [16]
 See id. at 361 & n. 2, 401 F.2d at 426 & n. 2
 
 
 [17]
 See id. at 363, 364, 401 F.2d at 428, 429
 
 
 [20]
 See Teston v. Carey, 150 U.S.App.D.C. 256, 257, 260, 464 F.2d 765, 766, 769 (1972) (11 to 12 years of contributory service); Belcher v. Carey, 82 L.R.R.M. 2437 (D.C. Cir. 1972) (11 plaintiffs with 81/2 to 161/2 years of signatory employment); DePaoli v. Boyle, 144 U.S.App.D.C. 364, 365, 447 F.2d 334, 335 (1971) (more than 8 years of signatory employment); Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970) (3 plaintiffs with signatory service ranging from 9 to 15 years); Collins v. UMWA Welfare and Retirement Fund, 141 U.S.App.D.C. 387, 439 F.2d 494 (1970) (more than 12 years signatory employment); Affidavit of Joseph A. Reid, SJA 30 (Pete) (listing total signatory service of plaintiffs in prior litigation in the United States District Court for the District of Columbia)
 
 
 [21]
 See 141 U.S.App.D.C. at 402, 439 F.2d at 508
 
 
 [22]
 Resolution No. 83 is set forth and discussed in DePaoli v. Boyle, 144 U.S.App.D.C. 364, 367 & nn. 10-11, 447 F.2d 334, 337 & nn. 10-11 (1971)
 
 
 [23]
 Pertinent portions of Resolution No. 89 are quoted in Pete v. UMWA Welfare and Retirement Fund, 352 F.Supp. 1294, 1297-98 (D.D.C.1973)
 
 
 [24]
 See JA 66a-77a (Kiser)
 
 
 [25]
 See JA 4a (Pete); JA 9a (Kiser)
 
 
 [26]
 See Kiser v. Carey, 353 F.Supp. 736, 743-44 (D.D.C.1973). In its opinion granting summary judgment, the Kiser court ordered the payment of past pension benefits from the first day of the month following the date upon which the plaintiffs' pension applications were denied
 
 
 [28]
 See Blankenship v. Boyle, 329 F.Supp. 1089 (D.D.C.1971). Damages were assessed in an opinion reported at 337 F.Supp. 296 (D.D.C.1972)
 
 
 [29]
 Prospective relief was afforded all class members regardless of whether they had previously made application for pension benefits but retroactive payments of up to one year's pension were limited to those class members whose applications had been filed prior to April 1, 1971, and had been denied by the Fund. See Final Judgment and Order Approving Settlement of Regulation Issues, Civ. Action Nos. 2186-69, 2350-69 (D.D.C. Feb. 26, 1973)
 
 
 [30]
 See id; Memorandum, Civ. Action Nos. 2186-69, 2350-69 (D.D.C., Feb. 26, 1973)
 
 
 [31]
 See Kiser v. Carey, 353 F.Supp. at 740; Pete v. UMWA Welfare and Retirement Fund, 352 F.Supp. at 1298-99. Appellants' Brief on Rehearing En Banc at 11
 
 
 [32]
 See, e. g., Roark v. Boyle, 141 U.S.App.D.C. 390, 392, 439 F.2d 497, 499 (1970); Gaydosh v. Lewis, 133 U.S.App.D.C. 274, 277, 410 F.2d 262, 265 (1969); Kosty v. Lewis, 115 U.S.App.D.C. 343, 346, 319 F.2d 744, 747 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964)
 
 
 [33]
 See id. at 398-401, 439 F.2d at 505-08. The recently enacted Employee Retirement Income Security Act of 1974, Pub.L.No. 93-406, sets five years as the minimum period of employment required to obtain a vested right to a percentage of a full pension
 
 
 [34]
 The class was defined to include, among others, miners who "should be receiving . . . pensions" and "who are entitled to receive but have been wrongfully denied pensions." See Complaint, August 4, 1969, at 3, Civ. Action No. 2186-69
 
 
 [35]
 See Settlement Agreement, Jan. 2, 1973, Civ. Action Nos. 2186-69, 2350-69, at 3. The settlement agreement excluded the Pete and Kiser miners from the plaintiff class. See id. at 5-6
 
 
 [36]
 See, e. g., Wainwright v. Kraftco Corp., 53 F.R.D. 78, 80 (N.D.Ga.1971); Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc., 52 F.R.D. 373, 375-76 (D.Kan.1971); Zerkle v. Cleveland-Cliffs Iron Co., 52 F.R.D. 151, 159 (S.D.N.Y.1971); Norman v. McKee, 290 F.Supp. 29, 32 (N.D.Cal.1968), aff'd, 431 F.2d 769 (9th Cir. 1970), cert. denied sub nom., Security Pacific Nat'l Bank v. Myers, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). See also 7A C. Wright & A. Miller, Federal Practice and Procedure § 1797 (1972)
 
 
 [37]
 See Memorandum, Civ. Action Nos. 2186-69, 2350-69, at 1-2 (D.D.C., Feb. 26, 1973); Final Judgment and Order Approving Settlement of Regulation Issues, Civ. Action Nos. 2186-69, 2350-69, at 2-3 (D.D.C., Feb. 26, 1973)
 A one year contributory requirement would have approximately doubled or tripled the number in the class. The actuarial comparisons of the disbursements for the one year and five year classes appear at JA 80a, 81a (Pete).
 
 
 [38]
 Section 302(c)(5), 29 U.S.C. § 186(c)(5) (1970)
 
 
 [39]
 141 U.S.App.D.C. at 392, 395, 439 F.2d at 499, 502
 
 
 [40]
 Id. at 396, 439 F.2d at 503
 
 
 [41]
 See 141 U.S.App.D.C. at 399 n. 7, 439 F.2d at 506 n. 7
 Statistics appended to a December 30, 1972 letter from Edward H. Friend & Co., Actuaries and Employee Relations Consultants, to Thomas F. Ryan, Jr., Comptroller and Acting Director of the UMWA Welfare and Retirement Fund, indicate, in conjunction with the date contained in Roark II, that union employment was equivalent to signatory employment from 1950 to 1962 and closely related immediately thereafter. (The letter is reprinted at JA 78a-81a (Pete) but the table is omitted.)
 
 
 [42]
 A review of the employment histories of 981 miners who qualified for pensions after 1960 revealed that only 4 pensioners had less than five years' contributory service
 
 
 [43]
 This court noted in Roark II that the purpose of the Fund would be "more fully carried out" by the use of a substantial signatory service requirement "geared to the applicant's entire contributory histories" but concluded that the Trustees had the authority to couple a substantial contributory service requirement with a signatory last year employment condition. See 141 U.S.App.D.C. at 396, 401, 439 F.2d at 503, 508
 
 
 [44]
 See note 43 supra
 
 
 [45]
 See note 20 supra
 
 
 [46]
 See Restatement (Second) of Trusts §§ 201, 226 (1959)
 
 
 [47]
 See 114 U.S.App.D.C. 105, 109, 312 F.2d 345, 349 (1962) (holding that a miner who met all existing criteria could not be denied a pension on the basis of requirements adopted by the Trustees after the date of his application)
 
 
 [48]
 See note 42 and accompanying text supra
 
 
 [49]
 See note 33 and accompanying text supra
 
 
 [50]
 See Memorandum and Order, Jan. 24, 1974, SJA at 50-53
 
 
 [51]
 See id., SJA 53. The court also appeared to rely on the fact that the Trustees had required only one last year of signatory service as a prerequisite to a pension. See id., SJA 52. The important practical distinction between the requirement of one last year and any one year of signatory service has been developed above. See text accompanying notes 41-42 supra
 
 
 [52]
 See note 20 supra
 
 
 [53]
 See 353 F.Supp. at 743-44
 The Kiser court also said that a "one year contributory employment requirement" was appropriate because the plaintiffs had been without any relief for several years during the pendency of the litigation. See id. at 744. But delay in receiving payment is not signficant unless there was a right to payment. Once a valid determination is made that some plaintiffs have been wrongfully denied pensions, then it is proper to take the delay in payment into account, as we have done in ruling that the deprivation be remedied with full retroactive relief including interest payments. See Part III infra.
 
 
 [54]
 Where as here the record points in only one direction, further proceedings at the trial level are not justified and this court, exercising its authority under 28 U.S.C. § 2106, may modify the judgment before it on review. See, e. g., Kosty v. Lewis, supra, 115 U.S.App.D.C. note 7, at 348, 319 F.2d at 749
 
 
 [55]
 See Appellants' Brief on Rehearing En Banc at 24
 
 
 [57]
 Board of County Comm'rs v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939). In addition 15 D.C.Code § 109 (1973) allows the jury or trial court to include "interest as an element in the damages awarded, if necessary to fully compensate the plaintiff." The Trustees appear to concede the applicability of that provision, which expressly applies to "damages in contract or tort," but argue that the equities counsel against an award of interest in this case. See Appellants' Brief on Rehearing En Banc at 27
 
 
 [58]
 See, e. g., Reiss S. S. Co. v. United States Steel Corp., 427 F.2d 1152 (6th Cir. 1970); Beaty v. Brock & Blevins Co., 319 F.2d 43 (6th Cir. 1963)
 
 
 [59]
 See Memorandum and Order, Jan. 24, 1974, SJA 55 (Pete)
 
 
 [60]
 See Supplemental Memorandum Opinion and Order, Feb. 6, 1973, JA 112a (Kiser)
 
 
 [61]
 See Memorandum and Order, Jan. 24, 1974, SJA 54 (Pete)
 
 
 [62]
 See 353 F.Supp. at 744
 
 
 [63]
 Judge Gesell recently gave careful consideration to the financial viability of the Fund before approving the massive Blankenship settlement. Studies submitted in Blankenship assumed that the Pete and Kiser class members would receive full retroactive relief. See Affidavit of Herbert P. Hoover in Blankenship v. UMWA Welfare and Retirement Fund, JA 75a-77a (Pete). Even on such assumptions the Blankenship settlement was found to be "reasonable and fair in light of . . . the financial position of the Fund." See Final Judgment and Order Approving Settlement of Regulations Issues, Civ. Action Nos. 2186-69, 2350-69, at 3 (D.D.C., Feb. 26, 1973)
 
 
 [64]
 See 28 D.C.Code § 3302 (1973) (establishing a 6 percent rate of interest in the absence of express contract)
 
 
 [66]
 Kiser v. Miller, 364 F.Supp. 1311 (D.D.C.)
 
 
 [67]
 364 F.Supp. at 1320
 
 
 [68]
 In addition, expenses were awarded as follows: $2,725.00 to Kiser class counsel; $891.32 to Moore counsel; $276.75 to Adkins counsel
 
 
 [69]
 326 F.2d 492 (1964)
 
 
 [70]
 Id. at 496. See 7A C. Wright & A. Miller, Federal Practice and Procedure 289 & n. 51 (1972) and cases cited therein. In Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968), our decision to set attorneys' fees directly rather than remand to the district court was based on the peculiar circumstances of that case, including our assessment that we were "best situated to appraise the worth of counsel's service in providing assistance in the salient decision making." Id. at 3, 408 F.2d at 1206
 
 
 [71]
 § 1.47 (3d ed.), published as supplement to C. Wright & A. Miller, Federal Practice and Procedure (1973) (hereinafter Manual)
 
 
 [72]
 DR § 2-106
 
 
 [73]
 (See notes 28-29, supra and accompanying text.)
 
 
 [74]
 The stated purpose of this discounting was "to compensate for the numerous telephone calls and conferences among attorneys, the time spent on the attorney fee question, and the discrepancies among the lawyers as to the time spent in court on hearings of various motions." 364 F.Supp. at 1318. Given the District Court's intimate familiarity with the developments at that level, we do not find the discounting of logged hours unreasonable. Note that despite its conclusion that the legal issues in this case are neither novel nor complex, the District Court did not attempt to second-guess class counsel on the amount of time counsel used in preparing the substance of plaintiffs' case
 
 
 [75]
 See Manual, supra note 71, § 1.47
 
 
 [76]
 The complaint in the companion Pete case was filed before Roark II was decided but after Roark I had declared the signatory last employment requirement presumptively invalid. The Pete class was certified on 30 September 1971, more than a year after Roark II
 
 
 [77]
 By order dated 6 August 1971
 
 
 [78]
 The extended length of this opinion reflects the complexity of the factual aspects of the instant case and does not indicate that the controlling legal principles have ever been in substantial doubt since Roark II was decided. When class counsel undertook this case, there was little risk that any material factual issues would be resolved against them since the Trustees have never made any effort to contest plaintiffs' factual allegations. Indeed, most of the material facts in this litigation are incontrovertible
 Our reasoning to this point applies with equal force to the counsel for intervenors Adkins, et al. and consolidated plaintiffs Moore, et al. It does not appear that the District Court acted unreasonably when it awarded the same fee to Adkins counsel as it had determined appropriate for Moore counsel. See text accompanying notes 67-68 supra.
 
 
 [79]
 Supp. Joint App. at 36sa
 
 
 [80]
 88 U.S.App.D.C. 206, 210, 188 F.2d 35, 39 (1951) (emphasis supplied)
 
 
 [81]
 364 F.Supp. at 1319
 
 
 [82]
 Ibid
 
 
 [83]
 Support for the District Court's conclusion may be found in the Manual for Complex Litigation, which identifies as a potential abuse of the class action device "solicitation of funds and agreements to pay fees and expenses from potential and actual class members who are not formal parties to the class action." Manual, supra note 71, § 1.41. To prevent such abuses, the Manual recommends
 that each court adopt a local rule forbidding unapproved direct or indirect written and oral communications by formal parties or their counsel with potential and actual class members, who are not formal parties, provided that such proposed written communications submitted to and approved by order of court may be distributed to the parties or parties designated or described in the court order of approval.
 Ibid. (emphasis original).
 
 
 [84]
 For reasons set out at 364 F.Supp. at 1319-20
 
 
 [85]
 364 F.Supp. at 1317
 
 
 [86]
 Payment of retroactive benefits to class members under the terms of the District Court's order, as affirmed herein, should of course proceed immediately and not be delayed pending this determination
 
 
 [87]
 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974)
 
 
 [88]
 Id. at 129-30, 94 S.Ct. at 2165 (footnotes omitted)
 
 
 [89]
 364 F.Supp. at 1320
 
 
 [90]
 Id. at 1321, citing Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)
 
 
 [10]
 The estimate was that of actuary Ethel Censor Rubin, who calculated that a total of $3,151,435.00 in pension payments had been denied plaintiff class members through 31 December 1972. Letter from Ethel Censor Rubin, 9 August 1973, Supp. Joint App. at 47
 
 
 [11]
 See, e. g., Green v. Transitron Electronic Corp., 326 F.2d 492, 496 (1st Cir. 1964); 7A C. Wright & A. Miller, Federal Practice and Procedure 289 & n. 51 (1972) and cases cited therein
 
 
 [12]
 130 U.S.App.D.C. 360, 401 F.2d 425 (1968)
 
 
 [13]
 364 F.Supp. 1311 (D.D.C.1973)
 
 
 [1]
 "The Fund does not, and cannot in good faith, assert that the question presented here involves consideration of possible staggering financial impact to the Fund or its present pensioners and other beneficiaries as a result of the payments ordered only for the class plaintiffs whose pension applications are still in controversy in these two cases. Members of the two plaintiff classes who had not completed five years' signatory service at the time of their pension applications are essentially a handful a total of fewer than 50 in both cases together to be added to a pension-receiving population of more than 75,000, and a total beneficiary population of more than 600,000." (Br. pp. 7-8)