Gracie ROBINSON et al., Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUNDS et al., Defendants.

Civ. A. No. 77-0698.

United States District Court, District of Columbia.

April 25, 1978.

See also, D.C., 435 F.Supp. 245.

Steven J. Millemann, Larry F. Sword, Applachain Research and Defense Fund of Kentucky, Inc., Prestonburg, Ky., Wayne Moore, Legal Counsel for the Elderly, Washington, D. C., for plaintiffs.

Henry S. Ruth, Jr., Timothy J. Parsons, Washington, D. C., for defendants.

## MEMORANDUM

GESELL, District Judge.

In this class action survivors of certain deceased coal miners seek an order directing the defendant trustees of the United Mine Workers of America Health and Retirement Funds ("Funds") to pay them permanent health care coverage in the case of spouses and coverage to age 22 in the case of dependents.[1] The class represents all surviving spouses and dependents of deceased miners who satisfied the age and service requirements for pension benefits at the time of death and who

(1) were working in classified service in the coal industry at the time of death and had not applied for a pension, or

(2) had applied for and were eligible to receive pension benefits but were not receiving such benefits at the time of death because of their return to classified service in the coal industry.

The parties filed cross-motions for summary judgment. After oral argument the Court invited submission of additional information. The information has been received, and the case is ready for decision.

The background to plaintiffs' claim is somewhat complex. Pensions and health and death benefits of the mine workers are funded by fixed, per-tonnage royalties paid by the so-called "signatory" coal operators. Prior to December 1974 the benefits were governed by the provisions of the United Mine Workers Welfare and Retirement

---

1. Hereafter referred to simply as "permanent" health care.

Fund of 1950 (the "1950 Fund") and by various resolutions promulgated by the trustees of the Fund, who were authorized to establish eligibility criteria. Under this scheme the unremarried surviving spouse and dependents of a deceased working miner eligible for benefits received $5,000 in death benefits and five years of full health coverage. The spouse and dependents of a deceased pensioned miner received $2,000 and two years of health care.

The National Bituminous Coal Wage Agreement of 1974 (the "1974 Agreement"), negotiated through arduous collective bargaining between the mine workers and the coal operators, dissolved the 1950 Fund and created in its stead four separate trusts (collectively referred to as the "Funds"), all administered by the defendant trustees. The eligibility requirements under these trusts are set out in the trusts themselves. Two of these trusts govern pensions and two cover health and death benefits. This case concerns only the latter.

The two health and death benefit trusts established in 1974 are confusingly entitled the "1974 Benefit Plan and Trust" and the "1950 Benefit Plan and Trust" (the "1974 Trust" and the "1950 Trust," respectively). They govern as follows:

(a) The 1974 Trust applies to all miners who died after December 1974, whether active or retired. It provides the surviving spouses and dependents of a deceased active miner with permanent health care and a death benefit of $7,500. Where the decedent is a pensioner, the survivors receive permanent health care and $2,500.

(b) The 1950 Trust deals with the survivors of miners already deceased at the time of the 1974 Agreement. It provides survivors of a pensioner benefits identical to those of a deceased pensioner under the 1974 Trust: $2,500 in death benefits and full health coverage. Survivors of deceased active miners, however, do not receive an equivalent benefit; rather they receive $5,000 in death benefits and only five years of health coverage.

Plaintiffs are all survivors of active miners who died before the 1974 Agreement, and their benefits are governed under (b) above. They claim that the 1950 Trust irrationally denies them the permanent health care enjoyed by the survivors of all other pension-eligible miners, whether active or retired. Had their decedents been pensioners, or had they applied for but not yet received pensions prior to their deaths, or had they died after 1974, members of the plaintiff class could have received permanent, rather than five years' health care. Plaintiffs do not charge the trustees with any failure to carry out the terms of the trust agreements as written; they claim instead that the disparate treatment accorded them by the trusts violates section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5) (1970), and section 404(a)(1) of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1104(a)(1) (Supp. V 1975), and consequently that the trustees' failure to reform the trust in their favor constitutes a breach of fiduciary responsibility.[2]

■ The exclusion of plaintiffs from the permanent health care coverage provided survivors of all other pension-eligible miners requires close scrutiny. But simply because a benefit trust differentiates among different classes of employees does not of itself mean that the trustees have violated the Taft-Hartley Act or any other law. See, e. g., Toensing v. Brown, 528 F.2d 69, 71 (9th Cir. 1975). Under the Taft-Hartley Act and ERISA a trust provision is voidable only if it fails to operate for the "sole and exclusive benefit" of the employees on whose behalf the contributions are made. An arbitrary denial of permanent health care coverage to plaintiffs will not satisfy this standard. See Burroughs v. Board of

---

**2.** Plaintiffs' additional claim that the trust provisions operate in derogation of vested rights is completely without merit since neither plaintiffs nor their decedents ever had any vested rights to permanent health care.

A claim that the trust provisions violated federal securities laws was dismissed in an earlier opinion. Robinson v. United Mine Workers of America Health and Retirement Funds, 435 F.Supp. 245 (D.D.C.1977).

*Trustees of Pension Trust Fund for Operating Engineers,* 542 F.2d 1128, 1131 (9th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Pete v. UMWA Welfare and Retirement Fund of 1950,* 171 U.S.App.D.C. 1, 9, 517 F.2d 1275, 1283 (1975) (en banc); *Roark v. Lewis,* 130 U.S. App.D.C. 360, 361–362, 401 F.2d 425, 426–27 (1968); *Morgan v. Laborers Pension Trust Fund,* 433 F.Supp. 518, 524 (N.D.Cal.1977). If an arbitrary denial is shown, the trustees are bound to reform the objectionable provisions in spite of the fact that the eligibility standards are written into the trusts themselves. *See, e. g., Toensing v. Brown,* 528 F.2d 69, 72 (9th Cir. 1975). Indeed, this obligation is reflected in Article XX of the 1974 Agreement.[3]

In attacking the discrepancy, plaintiffs point to several factors. By all estimates the plaintiff class numbers between two and three hundred members and cannot increase in size. The number of survivors already receiving permanent health benefits approximates 35,000 and is growing. The significance of the plaintiff class in comparison to the total pool of permanent health care recipients, combined with the absence of any clear indication that the settlors in 1974 even recognized the discrepancy,[4] suggests to plaintiffs that their omission was unconscious and thus unreasoned. Furthermore, they argue, the discrepancy does not further any legitimate purpose of the Agreement. It does not reward plaintiffs' decedents as much as other pension-eligible miners for the substantial signatory service performed. More significantly, it in effect penalizes skilled and experienced employees who, like plaintiffs' decedents, chose to remain in signatory employment rather than retire. Since the trusts are directly dependent on signatory employment for the resultant payment of per-tonnage royalties,

this effect of the discrepancy is curious, to say the least. *Compare Gaydosh v. Lewis,* 133 U.S.App.D.C. 274, 277, 410 F.2d 262, 265 (1969), *with Lavella v. Boyle,* 144 U.S.App. D.C. 35, 38, 444 F.2d 910, 913, *cert. denied,* 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 89 (1971).

■ Plaintiff's showing does not wholly convince the Court of the arbitrariness of the discrepancy, but it does raise a presumption sufficient to shift the burden to defendants. *See Roark v. Lewis,* 130 U.S. App.D.C. 360, 363, 364, 401 F.2d 425, 428–29 (1968). Pursuant to the Court's request, defendants have endeavored to ferret out from the deliberations of the settlors (at which defendants were admittedly not present) some rationale for the discrepancy. The search has produced none. Although this historical void is not conclusive—for it is the trustees, not the settlors who are defendants—nonetheless the trustees have also failed to establish any persuasive post hoc rationale.

Defendant trustees argue that they did not establish, and thus they are bound to implement, the eligibility provisions agreed to by the settlors in the course of collective bargaining. This substantially misconceives the functions and obligations of the trustees, who represent the interests of the beneficiaries, not the settlors, and, as noted, must under both the terms of the Agreement and established law reform unlawful provisions of the Agreement. Similarly unpersuasive are the arguments, always made in opposition to reformation, that judicial intervention would restrain future collective bargaining efforts and would jeopardize the actuarial integrity of the Funds. As to the first, any incentive toward fair and reasonable bargaining is a beneficial, not an adverse effect of judicial interven-

---

3. Article XX provides that the trustees may alter the provisions of the trusts only with the approval of the settlors or where changes are required by "federal laws . . . [or] applicable court or governmental decisions or rulings."

4. Acting pursuant to the Court's request, defendants have submitted all the information

obtainable bearing on the intent of the settlors with regard to benefits for the plaintiff class. Three documents were produced, none of which demonstrate clearly that the settlors even considered the class. The inference to be drawn from the papers, if any, is that at least part of the class was intended to receive permanent health care.

tion; as to the second, an increase of less than one percent in the number of permanent health care recipients simply cannot be represented as a threat to the fiscal soundness of the Funds.

This is apparently not a case such as *Roark v. Lewis,* 130 U.S.App.D.C. 360, 401 F.2d 425 (1968), in which an evidentiary hearing would aid in the resolution of the difficult question before the Court. The Court has repeatedly invited the parties to bring forth evidence oral or documentary, bearing on the intent of the settlors or the rationale for the discrepancy. The parties appear to be agreed that nothing more can be produced. Based on the existing record, the Court can only conclude that defendants have failed to rebut the presumption of arbitrariness raised by plaintiffs. Accordingly, unless by May 12, 1978, defendants indicate to the Court relevant testimony that will be forthcoming from the settlors, summary judgment will be granted plaintiffs and denied defendants, and defendants shall be ordered to reform the trust provisions to equate plaintiffs' health benefits with those enjoyed by the survivors of all other miners who received, had applied for, or were otherwise eligible for pensions.

Defendants argue that if plaintiffs are to receive permanent health benefits, they must be required to repay $2,500 each, representing the excess in death benefits received over that received by the decedents of a pensioner. The Court does not agree. In the first place, it is not at all clear that such money will be owing: survivors of other miners receiving permanent health care coverage receive $7,500 in death benefits. Moreover, the relief in this case, if there is to be any, shall be prospective only, yet many class members may have spent money for health care since their five-year coverage ran out. Finally, it is obvious that many plaintiffs will now be unable to raise $2,500, and as a matter of equity should not therefore be denied a benefit due.

An order implementing the foregoing is filed herewith.