640 F.2d 416
 106 L.R.R.M. (BNA) 2441, 205 U.S.App.D.C. 330,
90 Lab.Cas. P 12,551,
2 Employee Benefits Ca 1086
 Gracie ROBINSON and Juanita Hager, on behalf of themselves
and all other persons similarly situated, Appellants,
v.
UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUNDS et al.
 No. 78-2047.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 20, 1979.
Decided Feb. 5, 1981.
 
 Larry F. Sword, Somerset, Ky., for appellants.
 Laura A. Kumin, Washington, D. C., with whom Timothy J. Parsons, William H. DuRoss, III, and E. Calvin Golumbic, Washington, D. C., were on the brief, for appellees.
 Before SPOTTSWOOD W. ROBINSON, III and ROBB, Circuit Judges, and DAVIS, Judge, United States Court of Claims.*
 Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.
 Concurring opinion filed by Judge DAVIS.
 Dissenting opinion filed by Circuit Judge ROBB.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 Trustees of the United Mine Workers health and retirement funds have denied permanent health-care coverage to the surviving spouses of two deceased coal miners. The disappointed claimants challenge the denial as arbitrary, and thus as a violation of Section 302(c) of the Labor-Management Relations Act.[1] The District Court entered judgment for the trustees, finding dispositive the fact that they had acted in reliance upon eligibility rules derived from "explicit, informed and intense" collective bargaining.[2] We hold that the eligibility standards themselves transgress federal law[3] and consequently are forbidden, even as the fruits of labor negotiations.[4] Accordingly, we reverse.
 
 
 2
 * Section 302(c) excepts from a general prohibition against nonsalary payments by employers to employees those which are made into a trust fund to provide the latter with health or retirement benefits.[5] The United Mine Workers of America (UMW) first erected such a fund in 1947.[6] Three years later it was replaced by the UMW Welfare and Retirement Fund of 1950, created by the National Bituminous Coal Wage Agreement of that year.[7] That agreement specified that each coal operator participating in the contract would contribute a designated sum for each ton of coal produced, and that the monies would be used for pension and health-care coverage, but left to the trustees the particularization of eligibility requirements for benefits and the amounts thereof.[8]
 
 
 3
 In 1974, pursuant to a new wage agreement, the 1950 fund was replaced by four trusts. Two of them govern only pension payments and so are not at issue here. Of the others, the "1974 Benefit Plan and Trust" provides health-care coverage prospectively for miners retiring after the wage agreement became operative on December 6, 1974; and "the 1950 Benefit Trust" replaced the earlier fund with coverage for miners who retired prior to the 1974 date.[9] Unlike their immediate predecessor, these two trusts undertake to limit the trustees' discretion to set eligibility standards. The 1974 wage agreement itself purports to establish the rules,[10] and the trustees are permitted to amend them unilaterally only to ensure compliance with applicable federal laws.[11]
 
 
 4
 Floyd Robinson and Paul C. Hager were active miners who died before the new trusts were adopted. Both were qualified for pensions by age and length of service, but chose instead to continue working and thus had not retired before their deaths.[12] Appellants, their widows, became eligible, as survivors of working miners, to receive approximately five years of health benefits from the fund then in effect.[13] A surviving spouse of an already retired miner was entitled to about two years of coverage.[14]
 
 
 5
 Several years later the 1974 wage agreement was adopted. It lengthened the period of benefits eligibility for at least some surviving spouses and dependents. The 1950 Benefit Trust extends permanent health-care coverage to the unmarried spouse and dependents of "a miner who dies ... (p)rior to the effective date of this Plan[15] ... at a time when he was receiving a retirement or disability pension under the eligibility rules" of the predecessor fund.[16] By the trustees' interpretation, this clause applies to survivors of miners who died while collecting pensions and, as well, to survivors of those who, though not actually receiving retirement payments at death, had ceased work and applied for them.[17] This construction, however, excludes widows and dependents of those miners who were eligible for pensions but who continued working and later died before applying for health-care benefits.[18] No such distinction is made in the terms of the 1974 Benefit Plan and Trust; survivors of those dying after December 6, 1974, will receive permanent benefits whether or not retirement actually occurred prior to death.[19]
 
 
 6
 Appellants were refused permanent health-care coverage because their husbands worked until their deaths, respectively, in 1967 and 1971. On behalf of themselves and all others similarly situated, appellants sued in the District Court, charging that the trustees, by denying them such benefits, had acted arbitrarily and had violated their fiduciary duties, all in contravention of Section 302(c) of the Labor-Management Relations Act.[20] During the course of the proceedings, the court ruled that appellants had made a showing of arbitrariness sufficient to shift the burden of proof to the trustees, and that in the absence of further evidence apellants would be granted summary judgment.[21]
 
 
 7
 The trustees thereupon submitted documents and oral testimony pertaining to the conduct of the labor negotiations that culminated in the 1974 wage agreement containing the eligibility rules under which they had acted.[22] The court held that this evidence effectively rebutted appellant's prima facie case by establishing that the decision to exclude the appellant class from permanent health benefits was a rational choice consciously made by the participants in the collective bargaining.[23] The court accordingly entered judgment for the trustees, and this appeal followed.
 
 II
 
 8
 Our analysis must begin with an inquiry into the nature of the restrictions statutorily imposed on employee trust funds. Section 302(c) requires that the trusts be maintained "for the sole and exclusive benefit of the employees of (the contributing) employer, and their families and dependents."[24] It also requires that payments be made only for medical care, pensions, compensation for occupational injuries and other like purposes.[25] While these statutory provisions leave trustees with broad discretion to choose among rational alternatives in setting eligibility standards,[26] this court has long held that, because Section 302(c) casts authority to establish benefit programs in fiduciary terms, it forbids arbitrary or capricious decisions by those who administer the funds.[27] We have thus construed this section as demanding at least that the trustees' actions be procedurally fair[28] and that their factual judgments be based on substantial evidence.[29] Beyond this, however, we have consistently held that Section 302(c) also imposes substantive limitations on the nature of the eligibility rules that may be selected.[30] We summarize our reading on the latter score for the assistance it offers to resolution of the issue at bar.
 
 
 9
 Section 302(c), we repeat, requires trust funds to be held "for the sole and exclusive benefit of the employees of (the contributing) employer."[31] Any rule denying benefits to miners on whose behalf significant contributions to a pension fund have been made appears on its face to contravene this statutory command, and thus calls for satisfactory explanation.[32] This is particularly true if, at the same time, the rule grants benefits to others who have worked a considerably lesser period of time for contributing employers.[33] In all such circumstances, we have insisted that the trustees demonstrate some "rational nexus between the Fund's purpose and the (eligibility) requirement."[34] Standards producing otherwise arbitrary discrepancies may be acceptable where the rule discourages workers from taking voluntary action that shifts the burden of supporting the fund to other employees, for instance by retiring early,[35] by leaving the industry,[36] or by working for noncontributing employers.[37] Correspondingly, a differential is permissible when it rewards substantial service rendered employers who assist in maintaining the trust fund.[38]
 
 
 10
 What we must determine, then, is whether the rules challenged here meet the substantive demands of Section 302(c). Our task is made easier because the District Court expressly held, before receiving evidence describing the collective bargaining process from which the provision emerged, that the new eligibility standards appeared sufficiently arbitrary to compel judgment for the appellant class in the absence of further explanation.[39] None of the rationales offered had convinced the court that the restriction on eligibility complained of reasonably related to the fund's purpose, nor do they satisfy us. We must add, moreover, that we do not find the subsequent presentation to the court any more persuasive.
 
 
 11
 Like others that we have been forced to overturn,[40] the eligibility rules contested here exclude from permanent health-care coverage survivors of miners with substantial histories of contributory employment, while conferring that coverage on survivors of miners with appreciably less signatory employment. Appellants were themselves denied permanent health benefits despite more than 21 years of signatory employment by each of their husbands.[41] Contrastingly, the eligibility rules qualify survivors of miners with as little as one year of contributory service for permanent coverage so long as their husbands actually retired before death.[42] The facial inequity of this arrangement is further highlighted by the fact that the husband of one appellant died five days after reaching age 55, having met all requirements and intending to retire but failing to do so within the short period elapsing after his birthday.[43] Additionally, the rules reward those early retirees for whom no further contributions are made into the health-benefit fund. Such a course is surely questionable in terms of statutory purpose.[44]
 
 
 12
 Nonetheless, the eligibility standards applied by the trustees could have passed muster had they been shown to be rationally related to the fund's purposes.[45] We find no such proof, however. The trustees relied on the fact that they adopted the challenged eligibility rules not as in bygone days under broad authority granted them in collectively-bargained agreements, but at the specific direction of union and management representatives negotiating the 1974 wage agreement.[46] The District Court accepted this explanation as adequate justification,[47] and we too are sympathetic toward a compromise hammered out by "explicit, informed and intense" bargaining on a problem difficult of resolution in a mutually acceptable manner.[48] But, as we have already seen, Section 302(c) sets substantive limits on the rules established for employee trust funds;[49] as a consequence who formulated the eligibility standards and how it was done are irrelevancies. What is essential is that the eligibility rules themselves not be arbitrary or capricious in content when measured against the governing statute.
 
 
 13
 We hold that exclusion of the appellant class from permanent health-care coverage was arbitrary.[50] That it was the deed of labor-contract negotiators rather than fund trustees does not excuse it.[51] The Act does not permit bargainers to engage in discriminatory conduct forbidden to trustees; indeed, the statutory provisions operative here were designed especially to control abuses in the collective bargaining process.[52] We ourselves have read the Act as imposing curbs on eligibility definitions in pension plans despite the "presum(ption) that management and labor would agree on pension eligibility requirements."[53] Were we to find rationality in every rule arising from "explicit, informed and intense" bargaining,[54] we would establish a sure means of circumventing statutory restrictions on the entire front of employee trust funds.
 
 
 14
 Of course, the negotiators may select eligibility rules so long as they can advance an adequate explanation for their action. The only reason appearing on the record, however, is that the bargainers sought to eliminate an additional drain on the fund's resources in order to peg employer contributions at a mutually agreeable level.[55] But "financial considerations by themselves should not be sufficient justification for an exclusive eligibility requirement as every exclusive eligibility requirement would have the virtue of saving money."[56] To be sure, actuarial soundness is of legitimate concern to a fund's trustees,[57] but financial integrity must be secured by methods dividing beneficiaries from nonbeneficiaries on lines reasonably calculated to further the fund's purposes. It is not enough that the particular eligibility standards were adopted simply because that enabled resolution of a collective bargaining dispute.
 
 
 15
 After ample opportunity, no legally acceptable justification for exclusion of the appellant class from permanent health-care benefits has been proffered. It follows that the eligibility rules achieving that end must fall. The judgment appealed from is reversed and the case is remanded to the District Court for determination of the relief properly to be afforded.
 
 
 16
 So ordered.
 
 DAVIS, Judge, concurring:
 
 17
 Because the District Court stressed that the rule challenged here was the result of "explicit, informed and intense" bargaining on a difficult problem by labor and management, I think it right for me to spell out in greater detail some reasons why I join the court's opinion and result.
 
 
 18
 1. I agree, of course, that the health-care eligibility standards must be gauged by the standards of non-arbitrariness and non-capriciousness. The statute provides no other criterion. But though the formal rubric is the same, I do not think that the content of the terms arbitrary and capricious is the same under section 302(c) for the 1974 collective bargaining agreement as if those very same eligibility terms had been embodied in a statute enacted by the Congress. Because Congress is the legislature, endowed by the Constitution with law-making authority, courts should give great deference to provisions adopted by the Congress. Congress, moreover, theoretically represents all segments of the people including those groups subordinated or passed over by particular legislation granting benefits; except perhaps for fundamental rights or suspected classes, it is usually hard to see arbitrariness or capriciousness in a Congressional choice at a particular time of recipients for benefits. Private bodies, including a joint group of labor and management conferees, are different. They may not truly represent excluded groups or be interested in those subordinated and they do not have constitutional powers of legislation. Accordingly, I do not assume that the content of non-arbitrariness or non-capriciousness is the same for the case before us as it would be if Congress had enacted the eligibility standards for miners' or their survivors' health care. On the contrary, I believe that the standard of validity for the private collective bargaining agreement reaches higher than for legislation.
 
 
 19
 2. The record shows that the mine-operators balked at extended coverage to plaintiffs' class because (a) management was uncertain of and apprehensive about the number of pre-1974 widows in this class, and (b) management did not want to increase the lump amount for health and pension benefits payable per ton. But the record likewise shows that the labor side (a) insisted to almost the very end on including plaintiffs' class and (b) agreed at the last minute, summarily and without giving any reasons, to omit plaintiffs' class because the old contract was just about to expire and, if a general agreement was not reached before that moment, a strike would follow in all probability. So far as I can tell from the record, there was no quid pro quo for the dropping of labor's insistence on inclusion of this class and no reason was given by labor for omitting this specific class an overall agreement was reached in great haste to avoid labor conflict. I conclude that there was no reasoned decision by both sides to exclude this group, but rather a deliberate and hurried determination by the labor side to sacrifice this class in order to reach general agreement before the outbreak of overt labor conflict.
 
 
 20
 3. It is not necessarily an invalidating taint that a particular group has been sacrificed, but it can be if there is no good reason to choose that group and if it is so like others that are included that one seriously wonders why it was selected for the axe. Judge Robinson's opinion points out the close similarity of plaintiffs' group to others which the joint conferees agreed to cover. In particular, widows of eligible but working miners who died after December 6, 1974, receive permanent health care in contrast to plaintiffs whose husbands were likewise working but eligible for retirement but who happened to die before that magic date. Also, plaintiffs are excluded despite their husband's history of substantial, contributing signatory employment while other survivors are covered although their husbands has appreciably less signatory employment. There seems to be a plain discrimination against a group of miners, working but eligible (for retirement), who died prior to December 1974 and against their survivors.
 
 
 21
 Why did the labor side, which had pressed for inclusion of this group up to the very last moment, suddenly give up as to this class? It does not seem to be because these miners and survivors had been excluded under the pre-1974 plans. If that were so, coverage would not have been extended to the same class of people whose eligible but working husbands died after December 1974 (i. e. in the future).[1] One can suspect that these pre-1974 widows were less important to the union because their miner-husbands were already dead and no longer voting or active in the union. Whether or not this was so, the record reveals that no reason was given for the sudden concession on this point no effort to distinguish this group from others similarly placed, no receipt of something (other than mere agreement in time to avert a strike) in return for this concession.
 
 
 22
 4. If, as here, one side of a joint bargaining group is to sacrifice discriminatorily, it appears on the surface one of the interests it represents, there must at the least be some adequate reason for choosing that particular group to downgrade. It would not be a sound reason that the excluded group is impotent or less powerful in the union.[2] Here, no other, acceptable reason appears, or has been given, for abandoning at the last minute this specific group in order to attain a timely agreement with the operators. Even if I assume that the union side could truly choose at random to exclude one group in order to contain overall cost and reach agreement in time, there is no showing or reason to believe that plaintiffs' class was selected for dropping by such an indisputably random method. I have to draw the conclusion, therefore, that plaintiff's class was deliberately left out by a process or for reasons which do not meet the standard of non-arbitrariness and non-capriciousness required under section 302(c) for these private-group eligibility standards. There may well have been "explicit, informed and intense" bargaining as a whole, but in the end this particular group was abruptly left uncovered for no acceptable reason and by no acceptable process.[3]
 
 ROBB, Circuit Judge, dissenting:
 
 23
 I dissent for the reasons stated by the District Court in its unreported memorandum and order of June 20, 1978. Robinson, et al. v. United Mine Workers of America Health and Retirement Funds, C.A. 77-0698 (D.D.C. June 20, 1978). The District Court wrote:
 
 MEMORANDUM AND ORDER
 
 24
 Pursuant to the Court's Memorandum and Order filed April 25, 1978, defendants submitted evidence indicating the intent of the settlors and the circumstances leading to the disputed trust provisions. The evidence is of two forms:
 
 
 25
 (1) a set of union documents prepared prior to and in the course of the 1974 negotiations (during which the trusts were established), which reflect both the union's initial bargaining position and the emerging status of the benefit provisions in question as negotiations progressed;
 
 
 26
 (2) the oral testimony of participants in the negotiations, two of whom represented the union and one the coal operators. These witnesses detailed the developments in a subcommittee and at the main bargaining table at various times during which the provisions in question were considered.
 
 
 27
 The documents and testimony are sufficient to rebut plaintiffs' prima facie case. They established clearly that the question of whether or not to provide plaintiffs the benefits they now seek was the subject of explicit, informed and intense bargaining. The union urged provision of permanent health benefits for all survivors of all deceased pension-eligible miners; the operators balked at the anticipated cost. Both sides recognized that the magnitude of the plaintiff class could not be practically determined. The union agreed to forego its demand for permanent health care for plaintiffs in return for other benefits for working miners.
 
 
 28
 The duties of the trustees in administering the trusts differ distinctly from those of the collective bargainers in negotiating. See Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 400 (404) U.S. 157, 170 (92 S.Ct. 383, 393, 30 L.Ed.2d 341) (1971); Ford Motor Co. v. Huffman, 345 U.S. 330, 337-38 (73 S.Ct. 681, 685-86, 97 L.Ed. 1048) (1953); Miniard v. Lewis, 387 F.2d 864, 865 n.5 (D.C.Cir.1967), cert. denied 393 U.S. 873 (89 S.Ct. 166, 21 L.Ed.2d 144) (1968). However, unless the discrepancy wrought by the trusts was "arbitrary or capricious in light of all the circumstances involved," Norton v. IAM National Pension Fund, 553 F.2d 1352, 1356 (D.C.Cir.1977), the trustees are bound to adhere to the terms of the agreement. In this case their performance cannot be faulted. The decision to limit plaintiffs to five years of health benefits was both considered and rational. Whatever case hindsight gives to its merits, the decision stands as a legitimate product of deliberate and good-faith collective bargaining. There is no requirement that a benefit trust treat all beneficiaries identically, see Toensing v. Brown, 528 F.2d 69, 71 (9th Cir. 1975), and the differentiation here is not manifestly unjust.
 
 
 29
 Public policy dictates the limited role of courts in reviewing collectively bargained agreements. The familiar history of the anguished relations between the bargaining parties in this case only underscores the delicacy of the balance set in each agreement. Plaintiffs' relief, if indeed any is due, cannot come from the courts.
 
 
 30
 The Clerk of Court is directed to enter judgment for defendants. The foregoing, together with the earlier opinions of the Court, shall constitute the Court's findings of fact and conclusions of law in this case.
 
 
 31
 SO ORDERED.
 
 
 32
 I add only that in my opinion the distinction drawn in the trust agreement between the plaintiffs' class and other beneficiaries was reasonable because of financial considerations and because (1) under the agreement the widow of a deceased active miner receives a death benefit of $5,000 over five years, in addition to health benefits during those years, whereas the widow of a pensioner receives only a $2500 death benefit in addition to permanent health benefits, and (2) an active miner earns wages until his death, as opposed to a pension in a lesser amount, so the need of his family for health benefits may not be as great as that of a pensioner's family.
 
 
 33
 It is not for us to reform the trust agreement to conform to our notions of equity. See Tomlin v. Board of Trustees of Constr. Laborers Pension Trust, 586 F.2d 148, 151 (9th Cir. 1978).
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976)
 
 
 [1]
 Labor Management Relations Act of 1947, § 302(c), 29 U.S.C. § 186(c) (1976) (hereinafter cited as codified)
 
 
 [2]
 Robinson v. UMW Health & Retirement Funds, Civ. No. 77-0698 (D.D.C. June 20, 1978), at 1, Joint Appendix (J. App.) 95
 
 
 [3]
 See text infra at notes 24-44
 
 
 [4]
 See text infra at notes 45-57
 
 
 [5]
 29 U.S.C. § 186(c) (1976) reads in relevant part:
 The provisions of this section (forbidding transfers between employer and employees) shall not be applicable ... (5) with respect to money or other things of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon ... and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pension or annuities ....
 
 
 [6]
 See generally Van Horn v. Lewis, 79 F.Supp. 541 (D.D.C. 1948)
 
 
 [7]
 Record on Appeal (R.) 4, Appendix (App.) C (National Bituminous Coal Wage Agreement of 1950)
 
 
 [8]
 Id. at 4:
 Subject to the stated purposes of this Fund, the Trustees shall have full authority, within the terms and provisions of the "Labor-Management Relations Act, 1947," and other applicable law, with respect to questions of coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for provisions for benefits, investment of trust funds, and all other related matters.
 
 
 [9]
 R. 4, App.D (National Bituminous Coal Wage Agreement of 1974) at 27
 
 
 [10]
 Id. at 31-33
 
 
 [11]
 Id. at 31:
 The Trustees are authorized, upon approval by the Employers and the Union, to make such changes in the Plans and Trusts hereunder as they may deem to be necessary or appropriate.
 They are also authorized and directed, after adequate notice and consultation with the Employers and Union, to make such changes in the Plans and Trusts hereunder, including any retroactive modification or amendments, which shall be necessary:
 (a) to conform the terms of each Plan and Trust to the requirements of ERISA, or any other applicable federal law ....
 (d) to comply with all applicable court or government decisions or rulings.
 
 
 [12]
 When Floyd Robinson died in 1967, pension eligibility was governed by Resolution 63, which required 20 years of employment, attainment of age 55 and one year of "signatory" or "contributory" service work for an employer who is a signatory to the pension agreement immediately prior to retirement. Robinson's death occurred five days after his 55th birthday, while he was working for a signatory employer and after he had completed 25 years of industry employment, including 21 years of contributory service. J.App. 73-75. At the time of Paul C. Hager's death in 1971, Resolution 83 was in force; it required 20 years of service, attainment of age 55, and a total of five years of contributory employment with one year immediately prior to retirement. Hager had been credited with 24 years of service, all of which was with signatories, and was an active miner at the time of his death. Indeed, Hager had retired for a short period in 1968, but had resumed work because he was unable to support his family and himself on his pension. J.App. 76-78
 
 
 [13]
 When each died, Resolutions 68 and 69 specified the survivor's and health-care benefits due their widows. The surviving spouse of an active miner was to receive a survivor's benefit of $5,000 over a five-year period, and the widow of a retired miner a benefit of $2,000 over two years. R. 4, App. A (Resolution 68). Each was then entitled to health-care assistance while the survivor's benefit was payable. R. 4, App. B (Resolution 69)
 
 
 [14]
 See note 13 supra
 
 
 [15]
 See text supra at note 9
 
 
 [16]
 J.App. 26 (emphasis supplied)
 
 
 [17]
 R. 53
 
 
 [18]
 Id
 
 
 [19]
 See note 42 infra
 
 
 [20]
 See Brief for Appellants at 4
 
 
 [21]
 Robinson v. UMW Health & Retirement Funds, 449 F.Supp. 941, 945 (D.D.C. 1978)
 
 
 [22]
 See J. App. 98-211 (transcript of proceedings)
 
 
 [23]
 Robinson v. UMW Health & Retirement Funds, supra note 2, at 1, J. App. 95
 
 
 [24]
 29 U.S.C. § 186(c) (1976), quoted in pertinent part supra note 5
 
 
 [25]
 Id. The relevant portions of the statute are quoted at length in note 5 supra
 
 
 [26]
 E. g., Pete v. UMW Welfare & Retirement Fund of 1950, 171 U.S.App.D.C. 1, 9, 517 F.2d 1275, 1283 (en banc 1975); Roark v. Boyle, 141 U.S.App.D.C. 390, 392, 439 F.2d 497, 499 (1970); Johnson v. Botica, 537 F.2d 930, 935 (7th Cir. 1976); Lee v. Nesbitt, 453 F.2d 1309, 1311 (9th Cir. 1971)
 
 
 [27]
 Pete v. UMW Welfare & Retirement Fund of 1950, supra note 26, 171 U.S.App.D.C. at 9, 517 F.2d at 1283; Roark v. Boyle, supra note 26, 141 U.S.App.D.C. at 392, 439 F.2d at 499; Gaydosh v. Lewis, 133 U.S.App.D.C. 274, 277, 410 F.2d 262, 265 (1969); Roark v. Lewis, 130 U.S.App.D.C. 360, 362, 401 F.2d 425, 427 (1968); Kosty v. Lewis, 115 U.S.App.D.C. 343, 346, 319 F.2d 744, 747 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); Danti v. Lewis, 114 U.S.App.D.C. 105, 108 & n.3, 312 F.2d 345, 348 & n.3 (1962)
 
 
 [28]
 In Kosty v. Lewis, supra note 27, the trustees had altered the eligibility rules to require that the 20 years of service already prerequisite to a pension be rendered during the 30 years immediately preceding retirement. We held the change arbitrary and capricious in its effect on miners who met the old but not the new standard, since they were not given notice of the change and thus were unable to elect retirement before the new rule became effective and abrogated their pension eligibility. 115 U.S.App.D.C. at 347-348, 319 F.2d at 748-749. Absent any form of notification, we said, the modification lacked the fundamental fairness demanded of those with fiduciary responsibilities. Id. Similarly, in Danti v. Lewis, supra note 27, we rejected as procedurally flawed a decision to deny benefits because the miner's pension application did not demonstrate compliance with an eligibility standard adopted after it was filed, but before it was acted upon, since he thus was afforded no opportunity to show that he qualified under the amended rule. 114 U.S.App.D.C. at 109 n.4, 312 F.2d at 349 n.4
 
 
 [29]
 Danti v. Lewis, supra note 27, 114 U.S.App.D.C. at 108-109, 312 F.2d at 348-349
 
 
 [30]
 See cases cited infra notes 32-38
 
 
 [31]
 29 U.S.C. § 186(c) (1976), quoted in pertinent part supra note 5
 
 
 [32]
 Norton v. I.A.M. Nat'l Pension Fund, 180 U.S.App.D.C. 176, 181-182, 553 F.2d 1352, 1357-1358 (1977), Roark v. Lewis, supra note 27, 130 U.S.App.D.C. at 363, 401 F.2d at 428
 
 
 [33]
 Before us in Roark v. Lewis, supra note 27, was an eligibility standard prescribing that a miner must have 20 years of service but must also have retired immediately after a period of work for a signatory the so-called "signatory last employment" rule regardless of the total length of contributory employment. We found a prima facie showing of unreasonableness in a demonstration that under this requirement "employees could spend ... practically their entire adult lives working for mine owners who had contributed to the Fund since its inception; yet if they were to work for a non-signatory operator for any period after leaving a signatory operator, they would forfeit their otherwise valid pension claims." In sharp contrast, other miners could have worked 19 years for a noncontributing employer and get gain eligibility by only a year of signatory work. 130 U.S.App.D.C. at 363, 401 F.2d at 428. In Norton v. I.A.M. Nat'l Pension Fund, supra note 32, the pension agreement specified that should a signatory employer withdraw from participation, all service credits for his employees would be cancelled, including any earned while contributions were being made. We found it unnecessary to decide whether this provision was per se unreasonable, but we noted the similarity of its effects to those of the provision in Roark. 180 U.S.App.D.C. at 181-182, 553 F.2d at 1357-1358. The rule here involved has analogous consequences. See text infra at notes 41-44
 
 
 [34]
 Roark v. Lewis, supra note 27, 130 U.S.App.D.C. at 364, 401 F.2d at 429
 
 
 [35]
 See Gaydosh v. Lewis, supra note 27, 133 U.S.App.D.C. at 277, 410 F.2d at 265
 
 
 [36]
 See Assalone v. Carey, 154 U.S.App.D.C. 69, 73 & n.2, 473 F.2d 199, 203 & n.2 (1972); Giler v. Board of Trustees of Sheet Metal Workers Pension Plan, 509 F.2d 848, 849 (9th Cir. 1974)
 
 
 [37]
 See Roark v. Lewis, supra note 27, 130 U.S.App.D.C. at 364, 401 F.2d at 429
 
 
 [38]
 Pete v. UMW Welfare & Retirement Fund of 1950, supra note 26, 171 U.S.App.D.C. at 12-13, 517 F.2d at 1286-1287
 
 
 [39]
 Robinson v. UMW Health & Retirement Fund, supra note 21, 449 F.Supp. at 945
 
 
 [40]
 See notes 32-38 supra
 
 
 [41]
 See note 12 supra
 
 
 [42]
 This anomaly was produced by the provision, in effect at the time of Floyd Robinson's death, which demanded 20 years of industry employment but only one year of signatory service, although that one year must have been immediately prior to retirement. J.App. 73-75. We struck down the one-year signatory-last-employment requirement in Roark v. Boyle, supra note 26, 141 U.S.App.D.C. at 401, 439 F.2d at 508. Although under the rules presently operative, a miner still needs only five years of contributory service, see Pete v. UMW Welfare & Retirement Fund of 1950, supra note 26, 171 U.S.App.D.C. at 9, 517 F.2d at 1283, the disparity in widows' benefits at issue here cannot occur with respect to miners who retire or die after 1974 because the 1974 Benefit Plan and Trust provides permanent health-care coverage prospectively to surviving spouses of all pension-eligible miners, whether or not they retired before death. R. 17, at 4
 
 
 [43]
 See note 12 supra
 
 
 [44]
 See text supra at notes 30-33
 
 
 [45]
 See text supra at notes 34-38
 
 
 [46]
 See Robinson v. UMW Health & Retirement Funds, supra note 2, at 1, J.App. 95
 
 
 [47]
 Id
 
 
 [48]
 See text supra at notes 2, 22-23, infra at note 55
 
 
 [49]
 See notes 30-38 supra and accompanying text
 
 
 [50]
 See text supra at notes 39-44
 
 
 [51]
 See Toensing v. Brown, 528 F.2d 69, 72 (9th Cir. 1975):
 (T)rustees have a duty to exercise their independent judgment in administering trust funds established under § 302 of the Labor Management Relations Act. Recommendations of collective bargaining parties may be adopted by the trustees in the exercise of their discretion, but such recommendations are not binding or obligatory.
 The situation would be different had the negotiators themselves acted on grounds reasonable in light of the requirements of Section 302(c). But we find no acceptable explanations, see text infra at notes 55-57, and in the absence thereof the trustees cannot be allowed to pursue eligibility standards solely because the bargainers agreed to them. That this court has power to review the constitutional and statutory legality of substantive terms of a collective bargaining agreement is beyond dispute. See, e.g., NLRB v. Magnovox Co., 415 U.S. 322, 325-327, 94 S.Ct. 1099, 1102-1103, 39 L.Ed.2d 358, 362-363 (1974); Brotherhood of R.R. Trainmen v. Howard, 343 U.S. 768, 773-775, 72 S.Ct. 1022, 1025-1026, 96 L.Ed. 1283, 1288-1289 (1952); Steele v. Louisville & N.R.R., 323 U.S. 192, 199-202, 65 S.Ct. 226, 230-232, 89 L.Ed. 173, 181-183 (1944).
 
 
 [52]
 Arroyo v. United States, 359 U.S. 419, 424-427, 79 S.Ct. 864, 867-869, 3 L.Ed.2d 915, 919-920 (1959); Mosley v. National Maritime Union Pension & Welfare Plan, 438 F.Supp. 413, 421 (E.D.N.Y.1977) ("an important purpose of (§ 302(c)) was to protect employees from the collusion of union officials and management"). True it is, as the District Court here stated, that "(p)ublic policy dictates the limited role of courts in reviewing collectively bargained agreements." Robinson v. UMW Health & Retirement Funds, supra note 2, at 2, J.App. 97. But the history of employee trusts warns that neither labor nor management can be counted on invariably to represent fully and fairly the employees' interests therein. Blind deference is thus unsafe in reviewing the § 302(c) claims pressed here whether or not, as appellants allege, there was any bad faith on the part of the union negotiators. See Brief for Appellants at 23-24
 
 
 [53]
 Pete v. UMW Welfare & Retirement Fund of 1950, supra note 26, 171 U.S.App.D.C. at 12, 517 F.2d at 1286. Indeed, § 302(c) requires that "the detailed basis on which (benefits) payments are to be made (be) specified in a written agreement with the employer," 29 U.S.C. § 186(c)(5)(B) (1976), and that agreement is almost certain to be bottomed on collective bargaining. Moglia v. Geoghegan, 267 F.Supp. 641, 646 (S.D.N.Y. 1967), aff'd, 403 F.2d 110 (2d Cir. 1968), cert. denied, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969)
 
 
 [54]
 See Robinson v. UMW Health & Retirement Funds, supra note 2, at 1, J.App. 95
 
 
 [55]
 See, e. g., J.App. 126-128, 133-134, 147-149, 184-185
 
 
 [56]
 Fase v. Seafearers Welfare & Pension Plan, 432 F.Supp. 1037, 1041 (E.D.N.Y.1977), aff'd, 589 F.2d 112 (2d Cir. 1978)
 
 
 [57]
 Roark v. Boyle, supra note 26, 141 U.S.App.D.C. at 394, 439 F.2d at 501; Roark v. Lewis, supra note 27, 130 U.S.App.D.C. at 364, 401 F.2d at 429
 The record leaves unclear the financial impact of including the appellant class. There was testimony that the union negotiators felt that there might be an additional 4,000 widows, out of a total population of 40,000, who would thereby receive health benefits, but precise figures were unavailable. J.App. 125. Other testimony suggested the number might be less. J.App. 181, 190-191. The District Court concluded that "(b)oth sides recognized that the magnitude of the (appellant) class could not be practicably determined." Robinson v. UMW Health & Retirement Funds, supra note 2, at 1, J.App. 96. We note, however, that the class is not open-ended, as it includes only survivors of miners who qualified for pensions but died before December 6, 1974, while still in active service. See text supra at notes 15-19.
 
 
 [1]
 The December date was chosen because that was the effective date of the 1974 coal wage agreement
 
 
 [2]
 Nor would it have been an acceptable reason that the omission of plaintiffs' class would be unlikely to lead to bad publicity in the media. There is an indication in the record that the mine operators agreed, in another connection, to coverage of black-lung cases because they feared bad publicity if that different group were omitted
 
 
 [3]
 This court's ruling can be effectuated through the provisions of the 1974 Coal Wage Agreement authorizing the trustees to make changes in the plan necessary to conform to any applicable federal law or to comply with applicable court or government decisions or rulings. See note 11 of the court's opinion